Robert A. BLUMENSTETTER, Appellant

v.

The STATE of Texas, Appellee.

No. 06–02–00127–CR.

Court of Appeals of Texas, Texarkana.

Submitted April 5, 2004.

Decided April 6, 2004.

---

1. *Sowels v. State*, 45 S.W.3d 690 (Tex.App.-Waco 2001, no pet.)

Patrice Savage, Carthage, for Appellant.

Danny Buck Davidson, Carthage, for State.

Before MORRISS, C.J., ROSS and CARTER, JJ.

## OPINION

Opinion by Justice ROSS.

Robert A. Blumenstetter was convicted by a jury of intoxicated assault.[1] The jury assessed the maximum punishment of ten years' imprisonment and a $10,000.00 fine.

In *Blumenstetter v. State*, 117 S.W.3d 541, 543–45 (Tex.App.-Texarkana 2003, order), we determined the indictment under which Blumenstetter was tried was a valid indictment presented to the 123rd Judicial District Court of Panola County during its regular term. We abated Blumenstetter's appeal, however, and remanded the case to the trial court after determining Blumenstetter was denied assistance of counsel during the critical period for filing a motion for new trial. *Id.* at 545–48. We remanded the case to the trial court to the point at which Blumenstetter was convicted and his sentence imposed. *Id.* at 547. Blumenstetter filed a motion for new trial with the trial court. The trial court held a hearing on that motion and denied it by written order.

We now address Blumenstetter's remaining points of error. He contends the trial court erred by allowing the State's expert forensic chemist to testify to a legal conclusion and by incorrectly instructing the jury on community supervision. He also contends he was denied effective assistance of counsel.

## Background Facts

The State's evidence showed that a two-car collision occurred in Panola County involving a Ford pickup truck and a Ford Thunderbird automobile. Bruce Whitaker, the first person at the scene, testified that Blumenstetter was behind the wheel of the pickup truck when he arrived, that Blumenstetter smelled of alcohol, and appeared intoxicated. The automobile was driven by Carla Colburn. Carla's son, Christian, was a passenger in that vehicle and sustained life-threatening injuries.

David Rice, the Texas State Trooper who investigated the accident, testified the pickup truck, driven by Blumenstetter, crossed the center line and struck the Colburn vehicle. He also testified the intoxication of Blumenstetter was a factor in the accident. Blumenstetter's blood was drawn at a medical center two hours after the accident, and a blood-alcohol test re-

---

1. A violation of TEX. PEN.CODE ANN. § 49.07 (Vernon Supp.2004):
 (a) A person commits an offense if the person, by accident or mistake:

 (1) ... while operating a motor vehicle in a public place while intoxicated, by reason of that intoxication causes serious bodily injury to another; ....

vealed his intoxication at .20 grams of alcohol per 100 milliliters of blood, or .12 over the legal limit, which is .08.

**Legal Conclusion**

█ Blumenstetter contends the trial court erred by allowing Dennis Pridgen, the State's expert forensic chemist, to testify to a legal conclusion. The State called Pridgen, a forensic chemist employed by the Texas Department of Public Safety Crime Laboratory, to testify concerning Blumenstetter's blood-alcohol test. The chemist testified regarding the procedures used in conducting a blood-alcohol test and the results obtained from Blumenstetter's test. At the conclusion of his testimony, the State asked a series of questions to determine whether Blumenstetter was intoxicated at the time of the accident:

Q. I want to know your opinion as to whether or not the defendant was legally intoxicated. If your test showed .20, which is two and a half times, two hours later, do you have an opinion as to whether or not the defendant was legally intoxicated at 5:30 p.m. when the accident occurred?

A. Yes, sir. I would find it extremely difficult to come up with a scenario that would allow him not to be above .08 at the time of the accident, based upon an answer of .2 two hours later.

. . . .

Q. Okay. And you understand the burden of proof in a criminal case is beyond a reasonable doubt?

A. Yes, sir.

Q. In your opinion, do you feel that it is-that the defendant was legally intoxicated at 5:30 p.m. when he struck the other vehicle, beyond a reasonable doubt?

A. Yes, sir.

Blumenstetter did not object to this testimony. He therefore failed to preserve any error for review. *See Armstrong v. State*, 718 S.W.2d 686, 699 (Tex.Crim.App. 1985) (op. on reh'g). This point of error is overruled.

**Jury Charge on Community Supervision**

Blumenstetter contends the trial court erred by instructing the jury that, if it determined community supervision was appropriate, it was to assess the length of community supervision. The appropriate method for analyzing errors in jury charges is to first determine whether the jury charge contains error, and second, whether sufficient harm resulted from the error to require reversal. *Abdnor v. State*, 871 S.W.2d 726, 731–32 (Tex.Crim.App. 1994). The jury charge at the punishment phase of the trial stated in relevant part:

Our law provides that when the punishment assessed by a jury shall not exceed ten years confinement, the jury may recommend probation for a period of any term of years authorized for the offense for which the defendant is convicted without regard to the term of punishment assessed, but in no event may the period of probation be greater than ten years nor less than the minimum prescribed for the offense for which the defendant has been convicted. You are further instructed that if the jury fixes a punishment which may be legally probated, and if the jury recommends that such sentence be probated, the law provides that the jury shall determine and state in its verdict the length of time the defendant shall remain on probation.

. . . . If the punishment assessed by you is not more than ten years confinement in the Texas Department of Criminal Justice, Institutional Division and you further find that he has never before been convicted of a felony in this or any other state, and if you recommend probation in this case, then let your

verdict show the punishment which you assess and show that the defendant has never before been convicted of a felony in this or any other state, and further show the term of years for which you recommend that his sentence be probated.

■ This charge to the jury was in error, as it was in contradiction of Article 42.12, Section 4(b) of the Code of Criminal Procedure, which provides that:

If the jury recommends to the judge that the judge place the defendant on community supervision, the judge shall place the defendant on community supervision for any period permitted ... as appropriate.

Tex.Code Crim. Proc. Ann. art. 42.12, § 4(b) (Vernon Supp.2004).

■ The standard of review for errors in the jury charge depends on whether the defendant properly objected. *Mann v. State,* 964 S.W.2d 639, 641 (Tex.Crim.App. 1998); *Almanza v. State,* 686 S.W.2d 157, 171 (Tex.Crim.App.1984) (op. on reh'g); *Gornick v. State,* 947 S.W.2d 678, 680 (Tex. App.-Texarkana 1997, no pet.). If a proper objection was raised, reversal is required if the error is "calculated to injure the rights of defendant." *Almanza,* 686 S.W.2d at 171. In other words, an error that has been properly preserved is reversible unless it is harmless. *Id.* If a defendant does not object to the charge, reversal is required only if the harm is so egregious the defendant has not had a fair and impartial trial. *Rudd v. State,* 921 S.W.2d 370, 373 (Tex.App.-Texarkana 1996, pet. ref'd).

■ Where there has been no objection, we will reverse the cause only if an appellant has shown the error caused him egregious harm. *Abdnor,* 871 S.W.2d at 732; *see Peterson v. State,* 942 S.W.2d 206, 208 (Tex.App.-Texarkana 1997, pet. ref'd).

Egregious harm consists of errors affecting the very basis of the case or that deprive the defendant of a valuable right, vitally affect a defensive theory, or make the case for conviction or punishment clearly and significantly more persuasive. *Saunders v. State,* 817 S.W.2d 688, 692 (Tex.Crim.App.1991); *Hall v. State,* 937 S.W.2d 580, 583 (Tex.App.-Texarkana 1996, pet. ref'd). We determine harm in light of the entire jury charge, the state of the evidence, including contested issues and the weight of the probative evidence, the argument of counsel, and any other relevant information revealed by the record as a whole. *Mann,* 964 S.W.2d at 641; *Rudd,* 921 S.W.2d at 373. The purpose is to illuminate the actual, not just the theoretical, harm to the accused. *Rudd,* 921 S.W.2d at 373; *Hines v. State,* 978 S.W.2d 169, 175 (Tex.App.-Texarkana 1998, no pet.).

■ Blumenstetter did not object to the jury charge at trial, and the error did not cause him egregious harm. The instruction erroneously provided that the jury was to recommend the period of community supervision, if it first decided community supervision was appropriate. The jury did not recommend community supervision; therefore, it never needed to apply the erroneous instruction. The false impression given by the instruction would have likely inclined the jury to consider community supervision, rather than deny it. Under these circumstances, we hold Blumenstetter was not harmed by the erroneous instruction.

### Ineffective Assistance of Counsel

Blumenstetter further contends he was denied effective assistance of counsel. He contends his trial counsel was deficient in failing to: (1) file a motion to suppress the blood test; (2) object to the forensic chemist testifying on extrapolation; (3) object to

the forensic chemist testifying to a legal conclusion; (4) object to the jury charge on punishment which, instructed the jury it was to assess the duration of any community supervision; and (5) object to the jury charge on punishment, which provided an incomplete instruction on parole.

The traditional standard of testing claims of ineffective assistance of counsel is set out in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and adopted for Texas constitutional claims in *Hernandez v. State*, 726 S.W.2d 53, 57 (Tex.Crim.App.1986). To prevail on this claim, an appellant must prove by a preponderance of the evidence (1) that his or her counsel's representation fell below an objective standard of reasonableness, and (2) that the deficient performance prejudiced her or his defense. *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052; *Rosales v. State*, 4 S.W.3d 228, 231 (Tex. Crim.App.1999). To meet this burden, the appellant must prove that the attorney's representation fell below the standard of prevailing professional norms and that there is a reasonable probability that, but for the attorney's deficiency, the result of the trial would have been different. *Tong v. State*, 25 S.W.3d 707, 712 (Tex.Crim. App.2000). Under this standard, a claimant must prove that counsel's representation so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. *Strickland*, 466 U.S. at 686, 104 S.Ct. 2052.

Our review of counsel's representation is highly deferential; we indulge a strong presumption that counsel's conduct falls within a wide range of reasonable representation. *Id.* at 689, 104 S.Ct. 2052; *Tong*, 25 S.W.3d at 712. This Court will not second-guess through hindsight the strategy of counsel at trial; nor will the fact that another attorney might have pursued a different course support a finding of ineffectiveness. *Blott v. State*, 588 S.W.2d 588, 592 (Tex.Crim.App.1979). That another attorney, including appellant's counsel on appeal, might have pursued a different course of action does not necessarily indicate ineffective assistance. *Harner v. State*, 997 S.W.2d 695, 704 (Tex. App.-Texarkana 1999, no pet.). Any allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex.Crim.App.1999).

As far as strategic or tactical reasons for counsel's action or inaction, in the absence of direct evidence of counsel's reasons for the challenged conduct, an appellate court will assume a strategic motivation if any can be imagined. *Garcia v. State*, 57 S.W.3d 436, 440 (Tex.Crim.App.2001). We will not conclude the challenged conduct constitutes deficient performance unless the conduct was so outrageous no competent attorney would have engaged in it. *Id.; see also Thompson*, 9 S.W.3d at 814.

If the first prong is met, the appellant must also show that counsel's performance prejudiced the defense. *Strickland*, 466 U.S. at 691–92, 104 S.Ct. 2052. It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding. *Id.* Instead, the *Strickland* prejudice prong requires the defendant to show there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052. A reasonable probability is a probability sufficient to undermine the court's confidence in the outcome. *Id.* When addressing this second step of *Strickland*, the reviewing court should examine counsel's errors, not as isolated incidents, but in the context of the overall record. *Bridge v. State*, 726 S.W.2d 558,

571 (Tex.Crim.App.1986). Additionally, the reviewing court need not examine both *Strickland* prongs if one cannot be met. *Strickland,* 466 U.S. at 697, 104 S.Ct. 2052. In *Hernandez v. State,* 988 S.W.2d 770, 773 (Tex.Crim.App.1999), the Texas Court of Criminal Appeals held that the *Strickland* analysis applies equally to the punishment phase.

### 1. Failure to file a motion to suppress the blood test

Blumenstetter contends his blood test was taken in violation of Section 724.012 of the Texas Transportation Code and the Fourth Amendment to the United States Constitution. He contends his trial counsel should have, therefore, moved to suppress the blood test. At the hearing on the motion for new trial, Blumenstetter's trial counsel testified he reviewed the evidence from the State, interviewed the laboratory technician, interviewed the state trooper, and determined that the blood specimen was taken properly. We agree.

█ █ Blumenstetter contends Chapter 724 of the Transportation Code requires a person to be arrested before that person's blood specimen can be taken.[2] While Chapter 724 of the Transportation Code enlarges on what is constitutionally re-

quired with regard to blood samples when a person is under arrest for an intoxication-related offense, it does not apply to persons who are not under arrest when the blood sample is taken. *State v. Laird,* 38 S.W.3d 707, 713 (Tex.App.-Austin 2000, pet. ref'd). Accordingly, Texas courts apply the probable cause and exigent circumstances test in cases where a blood sample is taken from someone not under arrest. *Id.* (citing *Pesina v. State,* 676 S.W.2d 122, 123, 125 (Tex.Crim.App.1984); *Weaver v. State,* 721 S.W.2d 495, 497 (Tex.App.-Houston [1st Dist.] 1986, pet. ref'd); *Burkhalter v. State,* 642 S.W.2d 231, 232–33 (Tex.App.-Houston [14th Dist.] 1982, no pet.)).

█ Blumenstetter contends the taking of the blood was an unlawful search and seizure under the United States Constitution. The taking of a blood sample is a search and seizure under both the federal and Texas constitutions. *Aliff v. State,* 627 S.W.2d 166, 169 (Tex.Crim.App.1982). However, when officers have probable cause, exigent circumstances, and a reasonable method of extraction, taking a blood sample without a warrant or consent is not an unreasonable search and seizure, and does not violate the Fourth Amend-

---

**2.** The Transportation Code provides in relevant part that:

(a) One or more specimens of a person's breath or blood may be taken if the person is arrested and at the request of a peace officer having reasonable grounds to believe the person:

(1) while intoxicated was operating a motor vehicle in a public place, or a watercraft; . . . .

. . . .

(b) A peace officer shall require the taking of a specimen of the person's breath or blood if:

(1) the officer arrests the person for an offense under Chapter 49, Penal Code, involving the operation of a motor vehicle or a watercraft;

(2) the person was the operator of a motor vehicle or a watercraft involved in an accident that the officer reasonably believes occurred as a result of the offense;

(3) at the time of the arrest the officer reasonably believes that as a direct result of the accident:

(A) any individual has died or will die; or

(B) an individual other than the person has suffered serious bodily injury; and

(4) the person refuses the officer's request to submit to the taking of a specimen voluntarily.

TEX. TRANSP. CODE ANN. § 724.012 (Vernon Supp.2004).

ment. *See* U.S. Const. amend. IV; *Schmerber v. California,* 384 U.S. 757, 767–68, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966); *Aliff,* 627 S.W.2d at 169–70.

First, exigent circumstances exist in cases such as these because alcohol in blood is quickly consumed and the evidence may be lost forever. *See Aliff,* 627 S.W.2d at 169–70. Second, the taking of blood by a medical laboratory technician in a hospital is a reasonable method of extraction. Finally, probable cause existed to arrest Blumenstetter, who, according to the first person at the scene, was the sole occupant of the Ford pickup truck and was behind the wheel. Steven Mims, responding to the accident as a volunteer firefighter and who was the second person to arrive at the scene, advised police he passed Blumenstetter's Ford pickup just before the accident, that the driver of the pickup swerved into his lane, and that the driver was driving erratically. He testified that it was snowing and that the roads were slick. He estimated the driver of the pickup was traveling at sixty miles per hour. Rice conducted the investigation and determined that Blumenstetter crossed the center line while driving and struck the Thunderbird head-on. He testified that, at the time he was called to the scene of the accident, it had started to snow, but it "wasn't really affecting the driving." In his opinion, the weather was not a factor in the cause of the accident. He testified there was an overwhelming smell of metabolized alcohol inside the Ford pickup truck. These circumstances indicate there was probable cause to arrest Blumenstetter. *See Pesina,* 676 S.W.2d at 127 (finding probable cause where defendant found by police officer under wheel of wrecked pickup truck with strong odor of alcohol on breath). Therefore, trial counsel's omission in not moving to suppress the blood test was not error or below an objective standard of reasonableness.

## 2. Failure to object to testimony of State's forensic chemist

Blumenstetter contends his trial counsel should have objected to the forensic chemist testifying as an expert on extrapolation and also to the extrapolation testimony itself. He also contends trial counsel should have objected to the forensic chemist testifying to his conclusion Blumenstetter was, beyond a reasonable doubt, legally intoxicated at the time of the accident. We agree.

The State's expert forensic chemist testified as follows:

Q. .... Now, Mr. Pridgen, are you familiar with the term "peaking" when we're referring to alcohol and alcohol concentration?

A. Yes, sir.

Q. And in layman's terms, the speed with which I could get drunk would depend upon my size, what I had eaten, how fast my metabolism worked and the body broke down the alcohols and digested them and sent them on into my nervous system, something like that, right?

A. Yes, sir, along with how fast you're drinking.

Q. Yes, sir.

A. Your size is less important than the other factors that we mentioned.

Q. And the amount?

A. Yes, sir.

Q. If I got a big concentration, as opposed to starting in the morning and just constantly drinking, right?

A. If we're talking about speed, yes, sir.

Q. Yes, sir. Okay. Now, I want to—your test—and I believe we could—the

evidence is going to show the blood was drawn at 7:30, I believe, or 7:35.

A. 7:30.

Q. I believe the record is going to show the blood was drawn at 7:30 p.m. I think the accident report is going to show the wreck occurred at 5:30 p.m.

Now, I'm going to ask you to assume after the wreck that the defendant did not consume any other alcohol, he didn't consume any alcohol at the scene, and that the hospital didn't give him any alcohol to drink while he was at the hospital. So all alcohol consumption stopped at 5:30. Okay?

A. Yes, sir.

Q. I want to know your opinion as to whether or not the defendant was legally intoxicated. If your test showed .20, which is two and a half times, two hours later, do you have an opinion as to whether or not the defendant was legally intoxicated at 5:30 p.m. when the accident occurred?

A. Yes, sir. I would find it extremely difficult to come up with a scenario that would allow him not to be above .08 at the time of the accident, based upon an answer of .2 two hours later.

Q. Okay. Because as people consume alcohol, their bodies get more and more—

. . . .

Q. . . . . As a person drinks, they become more intoxicated; and then they quit drinking, they still go up to a point, peak; and then they turn around and start going back down as the alcohol is absorbed. Is that correct?

A. As it's eliminated.

Q. As it's—I'm sorry. As it's eliminated, it goes down. And I want to ask you that if the defendant had IV's in his system from the hospital, would that help eliminate the alcohol?

A. No, sir. It wouldn't help eliminate it, but it would reduce the concentration by dilution. Just like if you take a grape drink or grape concentrate or orange juice concentrate out of the refrigerator and you add water to it, where you had 100 percent orange juice then you have 50 percent orange juice after you add water. As they add the IV solutions into his bloodstream, then they dilute his blood and everything that's in it, including the alcohol, and reduce the concentration of alcohol that's present.

Q. Okay. And you understand the burden of proof in a criminal case is beyond a reasonable doubt?

A. Yes, sir.

Q. In your opinion, do you feel that it is—that the defendant was legally intoxicated at 5:30 p.m. when he struck the other vehicle, beyond a reasonable doubt?

A. Yes, sir.

Blumenstetter's trial counsel cross-examined Pridgen as follows:

Q. Mr. Pridgen. . . . I don't pretend to be a chemist, I'm not trying to ask you trick questions, and I don't believe we have any chemists on our jury.

So what I need to ask is that—when it's got a .20 grams of alcohol per 100 hundred [sic] milliliters two hours after the accident—and I believe you've testified that you believe he was 0.80 or—excuse me—0.08 or more at the time of the accident. Is that what you're testifying to?

A. I would find—I said I could not come up with a logical scenario that would allow him to be below that.

Q. What do you think he was? Do you have an opinion on that?

A. I really—no, sir. I could not give you an exact amount that he was at the

time because of all the factors we've introduced, the dilution from the IV's and all that sort of stuff.

I just do not see a way that he could have been below that, based on the fact that he would have had to have consumed an enormous amount of alcohol moments before the accident, and I mean moments before the accident, that had not had a chance to enter into his bloodstream in order for him to be to a .2 or above, which the dilution indicates he could have been higher than that at 7:30.

Q. But you really don't know what IV's were given to him or anything like that, do you?

A. No, sir. No, I don't.

Q. This was a scenario that was presented to you by the DA; is that correct?

A. Yes, sir.

Q. And we haven't really heard any testimony as to what was—or you haven't been presented any fact situation as to what was done to him at the hospital, have you?

A. No, sir. I only—I have been made aware that he was given IV's. But how much or anything beyond that, I have not been made aware of.

A. *Retrograde extrapolation testimony*

 Blumenstetter's trial counsel testified at the hearing on the motion for new trial that he did not object to the forensic chemist testifying as an expert on extrapolation because, drawing on his past experience as a prosecutor for ten years, he felt that, if he objected, the State would "come back and qualify him for that" and that, if he objected, it would only reinforce the expert's opinion. Counsel testified his strategy was to leave doubt in the jurors' minds regarding intoxication by emphasizing that Pridgen was only guessing as to Blumenstetter's intoxication at the time of the accident. He did admit, however, he was unfamiliar with the Texas Court of Criminal Appeals case of *Mata v. State*, 46 S.W.3d 902 (Tex.Crim.App.2001).

While counsel may have been aware of Pridgen's qualifications as an expert, had he been familiar with the *Mata* case, he would have known that Pridgen's testimony concerning the retrograde extrapolation in this case was unreliable and inadmissible.

In *Mata*, the Texas Court of Criminal Appeals discussed "retrograde extrapolation" in detail. The court defined retrograde extrapolation as the computation back in time of the blood-alcohol level, i.e., the estimation of the level at the time of driving based on a test result from some later time. *Id.* at 908–09. As alcohol is consumed, it passes from the stomach and intestines into the blood, a process referred to as absorption. *Id.* at 909. When the alcohol reaches the brain and nervous system, the characteristic signs of intoxication begin to show. *Id.* The length of time necessary for the alcohol to be absorbed depends on a variety of factors, including the presence and type of food in the stomach, the person's gender, the person's weight, the person's age, the person's mental state, the drinking pattern, the type of beverage consumed, the amount consumed, and the time period of alcohol consumption. *Id.* At some point after drinking has ceased, the person's blood-alcohol content (BAC) will reach a peak. *Id.* After the peak, the BAC will begin to fall as alcohol is eliminated from the person's body. *Id.* The body eliminates alcohol through the liver at a slow but consistent rate. *Id.*

The court went on to explain the "BAC curve," which represents the rise and fall of an individual's BAC as his or her body

absorbs and eliminates alcohol. *Id.* A reading from a single breath test will not reflect where the person is on her or his BAC curve. *Id.* In other words, it will not indicate whether the person is in the absorption phase, at the peak, or in the elimination phase. *Id.* So if a driver is tested while in the absorption phase, his or her BAC at the time of the test will be higher than his or her BAC while driving. *Id.* If tested while in the elimination phase, the BAC at the time of the test could be lower than while driving, depending on whether the driver had reached her or his peak before or after the driver was stopped. *Id.* Obviously, the greater the length of time between the driving and the test, the greater the potential variation between the two BACs. *Id.* at 909–10.

The court cited numerous studies on retrograde extrapolation, including one which cautioned that, "[h]owever useful such estimates may be in [DWI] cases, it should be remembered that the process of alcohol absorption is highly variable. The limitations and pitfalls associated with retrograde extrapolations are often not appreciated by laymen and the courts." *Id.* at 911. The study concluded that "[a]ny attempt at retrograde extrapolation should be made with caution, and performed by persons able to assess and discuss the applicability of a retrograde extrapolation to a particular situation." *Id.*

The court concluded that the science of retrograde extrapolation can be reliable in a given case. *Id.* at 916. The retrograde extrapolation expert's ability to apply the science and explain it with clarity to the fact-finder is a paramount consideration. *Id.* The expert also must show some understanding of the difficulties associated with retrograde extrapolation, as well as an awareness of the subtleties of the science and the risks inherent in any extrapolation. *Id.* Finally, the expert must be

able to clearly and consistently apply the science. *Id.*

In evaluating the reliability of retrograde extrapolation, a court should also consider (a) the length of time between the offense and the administration of the test(s); (b) the number of tests given and the interval between each; and (c) to what extent, if any, the individual characteristics of the defendant were known to the expert in providing his or her extrapolation. *Id.* These characteristics and behaviors might include, but are not limited to, the person's weight and gender, the person's typical drinking pattern and tolerance for alcohol, how much alcohol the person consumed on the day or night in question, what the person drank, the duration of the drinking spree, the time of the last alcoholic drink, and how much and what the person had to eat either before, during, or after the consumption of alcohol. *Id.*

The expert need not know every personal fact about the defendant to produce an extrapolation with the appropriate level of reliability. *Id.* If this were the case, no valid extrapolation could ever occur without the defendant's cooperation, given that a number of facts known only to the defendant are essential to the process. *Id.* If more than one test is administered at reasonable intervals, and the first test is conducted within a reasonable time of the offense, then an expert potentially could create a reliable estimate of the defendant's blood-alcohol content with limited knowledge of personal characteristics and behaviors. *See id.* In contrast, a single test conducted some time after the offense could result in a reliable extrapolation only if the expert had knowledge of many personal characteristics and behaviors of the defendant. *See id.* A case would fall "in the middle" if the expert is made aware of two or three of the defendant's personal characteristics and a single test was ad-

ministered to the defendant within a reasonable length of time from the traffic stop. *Id.* at 916–17.

In this case, Pridgen did not explain the science of retrograde extrapolation to the jury with any clarity. His only references were to its general principles, and he did not state what elimination rate he used. He also demonstrated no understanding of the difficulties associated with a retrograde extrapolation or the subtleties and risks of the science. Instead, his testimony was unequivocal that he could not come up with a logical scenario that would have had Blumenstetter below the legal limit at the time he was driving. This testimony was erroneous and fed the average individual's misconception that BACs only go down after time.

Regarding the other factors, there was only one test of Blumenstetter's BAC, and it occurred two hours after the alleged offense. As the *Mata* court found, this is a significant length of time and seriously affects the reliability of any extrapolation. *See id.* at 912, 917 (finding potential rate of error increased as time went on, and "this variability was particularly large" when extrapolation back one hour or more was attempted). In addition, Pridgen did not testify to one single personal characteristic of Blumenstetter. He did not testify that he based his conclusion on whether Blumenstetter had eaten anything, or how much; how much Blumenstetter had to drink; what Blumenstetter had to drink; when his last drink was; the length of Blumenstetter's drinking spree; or Blumenstetter's weight.

 We conclude that Pridgen's testimony on retrograde extrapolation was clearly inadmissible under *Mata.* To not object to the admission of prejudicial and arguably inadmissible evidence may be strategic; to not object to the admission of prejudicial and clearly inadmissible evidence has no strategic value. *Ex parte Menchaca,* 854 S.W.2d 128, 132 (Tex.Crim. App.1993) (citing *Lyons v. McCotter,* 770 F.2d 529, 534 (5th Cir.1985)). A criminal defense lawyer must have a firm command of the facts of the case *as well as governing law* before such lawyer can render reasonably effective assistance to his or her client. *Jackson v. State,* 766 S.W.2d 504, 509 (Tex.Crim.App.1985). Blumenstetter's trial counsel testified he was unfamiliar with *Mata.* That lack of knowledge prevented him from providing reasonably effective assistance to Blumenstetter.

Trial counsel testified he did not object because his strategy was to argue to the jury that Pridgen was guessing and that no one really knew Blumenstetter's level of intoxication at the time of the accident. He felt that, if he did object, the State would simply prove up Pridgen's qualifications and solidify his testimony to the jury. It is highly unlikely the State could have proven up the extrapolation testimony as reliable testimony. The *Mata* court stated a scenario where a single test conducted some time after the offense could result in a reliable extrapolation if the expert had knowledge of many personal characteristics and behaviors of the defendant. Blumenstetter testified at trial, and several of the relevant factors could have been elicited from him. It is unclear, however, whether those factors would have proven up Pridgen's conclusion or contradicted it. Blumenstetter testified he had consumed two large drinks of alcohol just before the accident. As the *Mata* court pointed out, a "chug-a-lug" method of drinking hard liquor would support the position that Blumenstetter was in the absorption phase at the time of the accident, therefore supporting the position that the subsequent BAC was higher than his BAC at the time of the accident. In light of the fact Pridgen did not explain the science of retrograde ex-

trapolation to the jury with any clarity, did not demonstrate an understanding of the difficulties associated with retrograde extrapolation, did not state what elimination rate he used, and the fact that Blumenstetter's BAC was taken two hours after the accident, the State would not have been able to prove up Pridgen's testimony on extrapolation as reliable testimony. Trial counsel's strategy to attack Pridgen's testimony as guesswork was not reasonably effective assistance because he could have completely excluded the testimony. By failing to object to Pridgen's testimony, counsel's assistance fell below an objective standard of reasonableness.

### B. *Legal conclusion*

Blumenstetter also contends trial counsel should have objected to Pridgen's testimony that Blumenstetter was, beyond a reasonable doubt, legally intoxicated at the time of the accident, on the ground he was testifying to a legal conclusion. Rule of Evidence 704 provides that "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." TEX.R. EVID. 704. Blumenstetter cites *Hopkins v. State*, 480 S.W.2d 212, 218 (Tex.Crim.App. 1972), where the Texas Court of Criminal Appeals concluded that, before an expert's opinion testimony can be admissible: (1) the expert must be competent and qualified to testify; (2) the subject must be one on which the aid of an expert opinion will be of assistance to the jury; and (3) the expert's testimony may not state a legal conclusion.

The Texas Rules of Evidence, however, do not specifically forbid a witness from testifying to legal conclusions. An expert may offer his or her opinion as to a mixed question of law and fact, so long as that opinion is based on proper legal concepts. *See* TEX.R. EVID. 704; *Birchfield v. Texarkana Mem'l Hosp.*, 747 S.W.2d 361, 365 (Tex.1987); *Lum v. State*, 903 S.W.2d 365, 370 (Tex.App.-Texarkana 1995, pet. ref'd).

This Court has described a mixed question of law and fact as one in which a standard or measure has been fixed by law and the question is whether the person or conduct measures up to that standard. *Crum & Forster, Inc. v. Monsanto Co.*, 887 S.W.2d 103, 134 (Tex.App.-Texarkana 1994, no writ). The classic example of a mixed question of law and fact is whether certain actions constitute negligence. *See Birchfield*, 747 S.W.2d at 365.

Under this guideline, it appears the question presented to Pridgen was a mixed question of law and fact. Pridgen was asked whether the facts surrounding Blumenstetter's drinking measured up to the legal standard of intoxication.

For a mixed question of law and fact to be admissible, however, it must meet the requirements of expert testimony in general. An expert must be competent and qualified to testify, and his or her opinion must be reliable and relevant. TEX.R. EVID. 702; *Louder v. De Leon*, 754 S.W.2d 148, 149 (Tex.1988). As previously discussed, Pridgen's testimony was objectionable because he was not shown to be qualified as an expert on retrograde extrapolation, nor was his testimony shown to be reliable.

In addition, expert testimony concerning whether an issue is proven beyond a reasonable doubt is not specialized knowledge which would assist a jury. Expert testimony assists a juror when the expert's knowledge is "beyond that of the average juror" and would help the juror understand the evidence or determine a fact issue. *K–Mart Corp. v. Honeycutt*, 24 S.W.3d 357, 360 (Tex.2000). When the

jury is equally competent to form an opinion about the ultimate fact issues or the expert's testimony is within the common knowledge of the jury, the trial court should exclude the expert's testimony. *Id.* Rule 702 makes inadmissible expert testimony as to a matter which obviously is within the common knowledge of jurors because such testimony, almost by definition, can be of no assistance. *Id.* As the Texas Court of Criminal Appeals noted in *Paulson v. State,* 28 S.W.3d 570, 571 (Tex. Crim.App.2000), reasonable doubt has a commonly accepted meaning, and "[i]t is not proper for the court to discuss what reasonable doubt is. The jury is as competent to determine that as the court." Pridgen's testimony on whether Blumenstetter was intoxicated beyond a reasonable doubt was, therefore, objectionable.

■ Trial counsel testified at the motion for new trial he simply did not know why he had not objected. Defense counsel, therefore, had no strategy by not objecting, and his failure to so object fell below an objective standard of reasonableness.

## C. *Prejudice*

■ We now must determine whether counsel's deficient performance prejudiced Blumenstetter's defense. As previously stated, the *Strickland* prejudice prong requires the defendant to show there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. A reasonable probability is a probability sufficient to undermine the court's confidence in the outcome. *Id.* The prejudice question is whether, absent counsel's error, the jury "would have had a reasonable doubt respecting guilt." *Id.* at 695, 104 S.Ct. 2052. When addressing the second step of *Strickland,* we examine counsel's

errors, not as isolated incidents, but in the context of the overall record. *Menchaca,* 854 S.W.2d at 132. There are several factors to determine whether the second step of *Strickland* has been met: the weight, nature, and focus of the evidence presented to the jury; the nature of the prosecutor's closing argument; and the relative role the evidence played in the outcome of the trial. *Id.* at 133.

The Texas Court of Criminal Appeals in *Bagheri v. State,* 119 S.W.3d 755, 763–64 (Tex.Crim.App.2003), analyzed the harm when the trial court erroneously admits retrograde extrapolation testimony. The court was examining the harmfulness of the error under the nonconstitutional framework of whether the erroneously admitted testimony might have prejudiced the jury's consideration of the other evidence or substantially affected its deliberations. *See id.* at 763. We are analyzing the harmfulness in this instance under the more stringent *Strickland* standard, but the court's analysis will be helpful to our determination. The *Bagheri* court found that important factors include "whether the State emphasized the error, whether the erroneously admitted evidence was cumulative, and whether it was elicited from an expert." *Id.* The court found harm from the admission of the extrapolation testimony, citing those factors. *Id.* The testimony was elicited from an expert. *Id.* The state emphasized, throughout the trial from voir dire to closing arguments, the fact that there would be scientific evidence from an expert showing that appellant's alcohol concentration was greater than .10 at the time of operating the vehicle. *Id.* The expert had testified in great detail about his qualifications and his "expert opinion" on a number of subjects, including his opinion that the scientific theory behind retrograde extrapolation is reliable. *Id.* The state, during closing argument,

emphasized the expert's qualifications and calculated the extrapolated range based on "scientifically reliable, valid evidence." *Id.* The court also found the extrapolation testimony was not cumulative evidence. *Id.* at 764. The court found that, although there was testimony from the arresting officer about the appellant's apparent intoxication and poor performance on the field sobriety tests, the appellant presented testimony supporting his assertion he was not intoxicated, but fatigued, when he was stopped. *Id.* In addition, during voir dire, numerous members of the jury panel expressed the belief that a person who fails a breath test is "flat-out" guilty of driving while intoxicated. *Id.* Several veniremembers also believed that alcohol concentration would therefore always be higher at the time of driving than it would be on a later intoxilyzer test. *Id.* The court found it could not say with fair assurance the erroneous admission of the retrograde extrapolation testimony did not influence the jury, or had but a slight effect. *Id.*

In this case, the retrograde extrapolation testimony was elicited from the State's expert on forensic chemistry. The State emphasized the expert's conclusion on Blumenstetter's intoxication level and emphasized throughout the trial that his opinion was "beyond a reasonable doubt." During voir dire, the State informed the jury panel about intoxication "peaking" and how there is a "going up" period in intoxication and a "going down" period. The State told the jury panel that "the results are going to show an overage an hour and a half later" and that "you're going to have to use your common sense. And it doesn't matter if he was going up or coming down . . . if he was above .08 when he was behind the wheel, he's intoxicated according to the law." He also mentioned

to the jury during opening statements an expert would testify Blumenstetter was intoxicated at the time of the accident. Pridgen testified in unequivocal terms concerning Blumenstetter's intoxication level at the time of the accident. He testified he could not come up with a logical scenario to have Blumenstetter below .08 two hours before a .20 BAC. In fact, he emphasized that opinion by stating Blumenstetter was intoxicated at the time of the accident, beyond a reasonable doubt. During closing arguments, the State again emphasized several times Pridgen's opinion that Blumenstetter was intoxicated, beyond a reasonable doubt.

We find, however, that the expert's retrograde extrapolation testimony and conclusion that Blumenstetter was intoxicated at the time of the accident, beyond a reasonable doubt, was cumulative of other evidence, and the results of the proceeding would not have been different had defense counsel objected.

Without reliable retrograde extrapolation testimony, it is unclear what Blumenstetter's BAC was at the time of the accident. There is significant evidence, however, that he was intoxicated at that time. Intoxicated is defined as "not having the normal use of mental or physical faculties by reason of the introduction of alcohol . . .; or having an alcohol concentration of 0.08 or more." Tex. Pen.Code Ann. § 49.01(2) (Vernon 2003).[3] Therefore, the jury only needed to believe beyond a reasonable doubt that either his blood-alcohol concentration was .08 or more, or that he failed to have the normal use of his mental or physical faculties by reason of introduction of alcohol into his body, at the time of the accident.

There was substantial other evidence of Blumenstetter's intoxication at the time of the accident. Whitaker testified Blumen-

stetter smelled of alcohol and appeared intoxicated. Mims testified he passed a Ford pickup truck just before the accident, and the driver was driving erratically and swerving into his lane. Mims identified Blumenstetter's Ford pickup as the same vehicle he had to avoid moments before. Rice also smelled the metabolized odor of alcohol inside Blumenstetter's truck and concluded Blumenstetter was intoxicated. He based that conclusion on the smell of alcohol and because Blumenstetter caused the accident by crossing the center line.

In addition, Blumenstetter testified he had consumed two alcoholic beverages, starting at "about 4:30, quarter of 5:00." He testified that he had two vodka "screwdrivers" mixed in a McDonald's cup and that he emptied the vodka bottle with the second "screwdriver." Blumenstetter testified he did not remember the accident. There was no evidence he consumed any alcohol after the accident, and his blood-alcohol reading of .20 two hours after the accident is relevant evidence he was intoxicated at the time he drove, under either definition of intoxication, because it provided evidence he had consumed alcohol. *See Stewart v. State*, 129 S.W.3d 93, 2004 Tex. Crim.App. LEXIS 380 (Tex.Crim.App. 2004) (finding breath test results relevant and admissible without retrograde extrapolation testimony because results were pieces in evidentiary puzzle for jury to consider in determining whether person was intoxicated at time of driving). Therefore, there was a substantial amount of evidence Blumenstetter was intoxicated at the time of the accident. Based on this evidence, defense counsel's failure to object did not prejudice Blumenstetter's defense because the result of the proceeding would not have been different.

### 3. *Failure to object to jury charge on punishment*

Blumenstetter contends his trial counsel should have objected to the jury charge on community supervision and parole. He contends the jury charge erroneously provided that the jury was to assess the length of community supervision if it determined community supervision was appropriate. We have already determined there was no harm to Blumenstetter from this failure. In that analysis, we stated that the false impression given by the instruction would have likely inclined the jury to consider community supervision, rather than deny it. Trial counsel did not recall why he did not object to the proffered instruction, but a tactical reason existed not to do so.

 Blumenstetter also contends his trial counsel should have objected to the instruction on parole, as it was an incomplete instruction. The charge concerning parole provided as follows:

> You are further instructed that in determining the punishment in this case, you are not to discuss among yourselves how long the defendant will be required to serve any sentence you decide to impose. Such matters come within the exclusive jurisdiction of the Board of Pardons and Paroles and are no concern of yours.

The Code of Criminal Procedure provides for a more detailed instruction on parole and the award of good conduct time. TEX.CODE CRIM. PROC. ANN. art. 37.07, § 4(c) (Vernon Supp.2004). It provides, among other things, that the jury may consider the existence of parole law and good conduct time, but it is not to consider the extent to which good conduct time may be awarded to or forfeited by a particular defendant. *Id.* There were ample tactical reasons for not objecting to the absence of this instruction. The full detailed instruction would have placed the existence of parole and good conduct time squarely

252

within the jury's consideration. The charge to the jury, in this case, simply advised the jury not to consider parole and good conduct time. Therefore, trial counsel's omission in not objecting to this part of the court's charge on punishment did not fall below an objective standard of reasonableness.

**Conclusion**

Blumenstetter did not preserve error on the forensic chemist's testimony concerning a legal conclusion, and he was not harmed by the jury instruction on community supervision. His trial counsel should have objected to the forensic chemist's testimony on retrograde extrapolation and his testimony concerning Blumenstetter's intoxication beyond a reasonable doubt. His trial counsel's deficiencies in this case, however, did not so undermine the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. The *Strickland* prejudice prong was not satisfied because Blumenstetter did not show that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

We affirm the judgment.