COURT OF APPEALS









COURT
OF APPEALS

EIGHTH
DISTRICT OF TEXAS

EL
PASO, TEXAS

 

JOSE RUIZ,                                                          )

                                                                              )              
No.  08-04-00102-CR

Appellant,                          )

                                                                              )                    Appeal from the

v.                                                                           )

                                                                              )               
243rd District Court

THE STATE OF TEXAS,                                     )

                                                                              )           
of El Paso County, Texas

Appellee.                           )

                                                                              )               
(TC# 20020D04253)

                                                                              )

 

 

O
P I N I O N

 

Appellant Jose
Ruiz appeals his conviction for intoxicated manslaughter.  Over his not guilty plea, the jury found
Appellant guilty and assessed punishment at 20 years=
imprisonment in the Institutional Division of the Texas Department of Criminal
Justice.  In six issues, Appellant
challenges the legal and factual sufficiency of the evidence, contends the
trial court erred in denying his motion to suppress his statement, and asserts
that his trial counsel rendered ineffective assistance.  We affirm.

SUMMARY
OF THE EVIDENCE








On June 30, 2002,
at approximately two o=clock
in the morning, Harald Wiendl, the victim, and 
Karl Peter were driving back to Holloman Air Force Base after spending
the night in El Paso at various clubs and restaurant bars.  Mr. Wiendl was driving a brand new Saab and because
he was the designated driver that night, he had not been drinking.  As they traveled on U.S. Highway 54, they
approached an accident scene.  Mr. Wiendl
slowed down and steered to the left side of the road because there was debris
lying in the road and then stopped.  All
of a sudden Mr. Peter felt something Alike
a hammer in [his] back@
and then saw Mr. Wiendl lying over him, bleeding out his ears, nose, and
mouth.  Appellant was the driver of the
vehicle that struck the victim=s
vehicle from behind.








Officer Robert
Salido and his partner were on patrol around 2:40 that morning when they
received a dispatch in reference to an accident on U.S. 54.  Moments later, they were notified that a
second accident had occurred.  As they
headed north on U.S. 54, Officer Salido could see the accident scene from a couple
of miles away.  When they arrived,
Officer Salido noticed that a black vehicle with extensive rear damage was in
one of the northbound lanes on the freeway. 
He also observed that a brown vehicle, a Buick Regal, with some front
end damage was on the dirt median facing southbound.  There were also two other vehicles off to the
right and left of the highway both with some damage.  Officer Salido=s
partner blocked off traffic and Officer Salido approached the black Saab.  He saw that two people were trying to help
the driver, who was bleeding profusely from the ear, nose, and mouth.  Officer Salido felt a faint pulse.  The victim=s
breath was becoming more and more shallow so Officer Salido called for EMS to
respond to the scene immediately.  The
victim=s pulse
stopped and when EMS arrived they tried to give the victim oxygen, but he was
nonresponsive.  Corinne Stern, chief
medical examiner for El Paso County, later performed an autopsy on Mr. Wiendl
and determined that the cause of death was blunt-force injuries to the head,
specifically, a lethal, serious fracture to his vascular skull, which caused
his brain to swell and herniate.  The
victim had no traces of alcohol or drugs in his bloodstream.

After EMS arrived
at the scene, Officer Salido turned his attention to the crowd and divided the
people into two groups:  those involved
in the accident and those that had witnessed the accident.  He collected identification from both
groups.  When Officer Salido filled out
an accident report, he characterized the victim=s
Saab as having  maximum damage to the
rear of the vehicle.  He characterized
the Buick Regal as having maximum front end damage.

Officer Isaac
Hernandez with the Special Traffic Investigations Unit (ASTI@), was assigned to investigate the
accident on U.S. 54.  Officer Hernandez
observed four vehicles that appeared to be involved in the collision.  With assistance from another officer, Officer
Hernandez collected measurements and began diagraming the scene.  He determined there were two vehicles
involved in the fatality and that the vehicles involved in the first crash had
nothing to do with the second one. 
According to Officer Hernandez, the vehicle with the fatality was struck
from behind by the vehicle that was now located in the median.  After they collided, the force spun the
vehicles around.  He found no skid marks
or debris on the roadway prior to the point of impact.  According to witnesses and police
observations, the accident scene was in a well-lit and non-curving area and the
weather was clear.  Two witnesses did not
see the Saab cut the Buick off and did not see the Saab switch lanes; rather
the Saab was traveling in the slow lane the entire time and just braked when it
approached the scene.  Another witness
driving behind the Saab, however, saw the Saab change lanes to avoid debris on
the road and then slow down.  When the
Saab changed lanes it was hit from behind by the Buick.








Officer John
Chantrell, an accident investigator for the STI Unit, reconstructed the
accident from a graphic representation of the diagram that was taken at the
scene.  Based on his speed calculations,
Officer Chantrell determined that the victim=s
car was traveling zero to ten miles per hour when it was struck.  He also determined that the vehicle now
located in the median was traveling between 52 to 60 miles per hour prior to
the point of impact.

Eugene O=Neil was driving home on U.S. 54 when
he observed the first accident on the roadway. 
He observed the second accident while he was rendering assistance to
victims of the first one.  He recalled
that the black Saab approached the accident scene at a high rate of speed and
then braked suddenly and slid up the road past all the parked cars, trying to
come to a stop.  He then saw a second
vehicle traveling just as fast and within seconds it slammed right into the
back of the black Saab without stopping. 
Mr. O=Neil
approached Appellant, the driver of the second vehicle, a Buick, and asked if
he was okay.  The driver was bleeding
from the nose, had his hands on the steering wheel, and looked like he was in
shock.  Mr. O=Neil
ran over to the black Saab because another bystander told him someone in that
vehicle was severely injured.  They
opened up the driver=s
door and saw that the driver was hurt badly. 
When the driver started bleeding out his ears, Mr. O=Neil tried to stop the bleeding with a
makeshift bandage and they tried to hold him still.  The victim, however, was losing consciousness
and by the time the paramedics arrived he had passed away.








Appellant was
transported by ambulance to the hospital for treatment of his injuries in the
accident and arrived at approximately 4 a.m. 
A blood specimen was collected at 4:15 a.m.  Officer Hernandez received a call on the
radio from an officer who had followed Appellant to the hospital from the
scene.  Officer Hernandez was informed
that Appellant was about to be released after treatment.  He asked the officer to ask Appellant if he
wanted to give a voluntary statement. 
The officer informed Officer Hernandez that Appellant wanted to give a
statement so Officer Hernandez said to bring him to the STI office.  Officer Hernandez testified that when
Appellant came to his office, he was not in handcuffs, not under arrest, and
free to leave at any time.  After
informing Appellant that he was not under arrest, he did not have to give a
statement, and was free to leave, he proceeded to take Appellant=s statement.  After giving the statement, Appellant called
a relative to take him home.  Appellant
was not arrested that day.

According to
Appellant=s
statement, he went dancing with a friend, and around 1 a.m., he left the bar
and went to Whataburger restaurant to eat. 
When he left to return home he got onto Highway 54.  As he traveled on the highway, he saw an
accident up ahead.  He noticed that the
two vehicles in the accident were off to the side.  As he got closer, he saw two vehicles stopped
in the road, one in each lane.  Appellant
became nervous and swerved to the left and struck the back of the vehicle in
the left lane.  Appellant lost
consciousness for a moment and afterwards he was taken to the hospital by
emergency personnel.  

Dr. John Haynes
testified as a toxicology expert for the State. 
According to his review of Appellant=s
medical records from the hospital after the accident, Appellant=s blood alcohol level was 0.1342 grams,
approximately 0.05 over the defined legal limit of intoxication in Texas.  Dr. Haynes testified that such a blood
alcohol level would impair an individual=s
mental and physical faculties.  Specifically,
the individual would not be able to perform tasks that he normally might
perform with the same speed or accuracy. 
In addition, that individual=s
thought processes, reasoning power, and judgment would be affected.








Dr. Haynes
explained the process of alcohol absorption in the body after it is
ingested.  According to Dr. Haynes,
alcohol is readily absorbed by the system and distributed throughout the body.  It primarily acts upon the central nervous system,
having deleterious effects on the brain. 
The doctor explained that as it is absorbed, alcohol circulates through
the liver, where it is broken down into substances that can be eliminated from
the body.  However, various factors such
as an individual=s sex and
food consumption can affect the body=s
rate of alcohol absorption. 
Specifically, if an individual consumes alcohol on an empty stomach,
absorption is fairly rapid, but if the individual ingests food, the food
dilutes the alcohol and slows the body=s
ability to absorb.  Based on a blood
alcohol level of 0.1342, Dr. Haynes opined that any individual with that high
level of alcohol in their system would be impaired, even individuals who have a
high tolerance for alcohol.  The doctor
believed that it would be dangerous for such an individual to operate a motor
vehicle.  Assuming that an individual was
not drinking from 2:40 a.m. until the time that the blood specimen was
collected at 4:15 a.m. and that the blood specimen results showed a blood
alcohol level of 0.1342, Dr. Haynes concluded that such an individual would
have had a higher level in his system at 2:40 a.m.  








Curtis Flynn, a
professional accident reconstructionist, testified for the defense.  After reviewing the police reports, diagrams,
and measurements, Mr. Flynn determined that the black Saab veered into the left
lane and into the path of Appellant=s
approaching vehicle and then applied the brakes and was struck from behind by
Appellant.  In his opinion, the victim=s unsafe lane change and stop caused
the accident.  On cross-examination, Mr.
Flynn agreed that the Saab had already completed the lane change when it was
struck.  Although there were no skid
marks prior to the collision, Mr. Flynn opined that Appellant=s vehicle could still have been decelerating,
but not skidding on the road surface, or in the initial stage of application of
the brakes.  Mr. Flynn did not factor in
alcohol consumption into his analysis. 
Based on his experience as a former police officer and accident
investigator, he was aware of the legal limit of intoxication and agreed that a
person with more than an 0.08 blood alcohol level would have impaired mental or
physical faculties.

DISCUSSION

MOTION
TO SUPPRESS

In Issues Three
and Four, Appellant contends the trial court erred in denying his motion to
suppress his written statement because he was in custody and the coercive
circumstances render his statement involuntary. 
In response, the State argues that Appellant was not in custody at the
time he gave his voluntary written statement.

Standard
of Review

We review the
trial court=s ruling
on a motion to suppress for an abuse of discretion.  Guzman v. State, 955 S.W.2d 85, 88-9
(Tex.Crim.App. 1997).  Under this
standard, we give almost total deference to the trial court=s determination of historical facts
supported by the record, especially when the findings are based on an
evaluation of credibility and demeanor.  Id.  We review de novo mixed questions of law
and fact that do not turn on an evaluation of credibility and demeanor.  Id; Balentine v. State, 71
S.W.3d 763, 768 (Tex.Crim.App. 2002). 
When the trial court does not make explicit findings of fact, we review
the evidence in a light most favorable to the trial court=s ruling.  Carmouche v. State, 10 S.W.3d 323,
327-28 (Tex.Crim.App. 2000).  The trial
court=s ruling
will be upheld if it is reasonably supported by the record and is correct on
any theory of law applicable to the case. 
State v. Ross, 32 S.W.3d 853, 855-56 (Tex.Crim.App. 2000).

Was
Appellant in Custody?








The State contends
that Appellant was not in custody when he gave his statement, it was not given
under coercive circumstances, and because the statement was not a product of
custodial interrogation and was given freely and voluntarily, the trial court properly
denied the motion to suppress the statement.

Whether Appellant=s statement was voluntary is only an
issue if the information was the result of custodial interrogation.  Rodriguez v. State, 939 S.W.2d 211,
215 (Tex.App.‑‑Austin 1997, no pet.); Morris v. State, 897
S.W.2d 528, 531 (Tex.App.‑‑El Paso 1995, no pet.); Holland v.
State, 770 S.W.2d 56, 58 (Tex.App.‑‑Austin 1989), aff=d, 802 S.W.2d 696 (Tex.Crim.App.
1991).  If Appellant=s statement does not stem from
custodial interrogation, suppression was not required.  See Tex.Code
Crim.Proc.Ann. art. 38.22, '
5 (Vernon 2005)(expressly excluding statements occurring outside of custodial
interrogations); Morris, 897 S.W.2d at 531.  Thus, we must determine whether Appellant was
in custody at the time he gave his written statement.

A person is Ain custody@
if, under the circumstances, a reasonable person would believe his freedom of
movement was restrained to the degree associated with a formal arrest.  Stansbury v. California, 511 U.S. 318,
322‑24, 114 S.Ct. 1526, 1528-30, 128 L.Ed.2d 293 (1994); Dowthitt v.
State, 931 S.W.2d 244, 254 (Tex.Crim.App. 1996).  The reasonable person standard presupposes an
innocent person.  Florida v.
Bostick, 501 U.S. 429, 438, 111 S.Ct. 2382, 2388, 115 L.Ed.2d 389 (1991); Dowthitt,
931 S.W.2d at 254.  The determination of
custody is based on objective circumstances. 
Stansbury, 511 U.S. at 322-23, 114 S.Ct at 1529.  Any subjective intent of law enforcement
officers to arrest is irrelevant unless that intent is communicated or
otherwise manifested to the suspect.  Id.
at 325-26, 114 S.Ct. at 1529-30.








Stationhouse
questioning does not, in and of itself, constitute custody.  California v. Beheler, 463 U.S. 1121,
1124‑25, 103 S.Ct. 3517, 3519-20, 77 L.Ed.2d 1275 (1983); Dowthitt,
931 S.W.2d at 255.  When a person is
transported to a law enforcement facility by an officer in the course of an
investigation, if the person was acting upon the invitation, request, or even
the urging of an officer and there were no threats that he would be taken in a
forcible manner, and the accompaniment is voluntary and consensual, then the
individual is not in custody.  Anderson
v. State, 932 S.W.2d 502, 505 (Tex.Crim.App. 1996); Bradley v. State,
960 S.W.2d 791, 801 (Tex.App.--El Paso 1997, pet. ref=d).  Police conduct during the encounter, however,
may cause a consensual inquiry to escalate into custodial interrogation.  Ussery v. State, 651 S.W.2d 767, 770
(Tex.Crim.App. 1983); Bradley, 960 S.W.2d at 801.

Texas courts have
identified four general situations which may constitute custody:  (1) when the suspect is physically deprived
of his freedom of action in a significant way; (2) when a law enforcement
official tells a suspect he cannot leave; (3) when law enforcement officers create
a situation that would lead a reasonable person to believe that his freedom of
movement has been significantly restricted; and (4) if there is probable cause
to arrest and law enforcement officials do not tell the suspect that he may
leave.  Dowthitt, 931 S.W.2d at
255, citing Shiflet v. State, 732 S.W.2d 622, 629 (Tex.Crim.App.
1985).  In the first three situations the
restraint upon freedom must be equivalent with that associated with an arrest
as opposed to an investigative detention. 
See id. at 255.  In the
fourth situation, the officer=s
knowledge of probable cause must be manifested to the suspect, and such
manifestation, considered in the totality of the circumstances, would lead a
reasonable person to believe he is not free to leave.  Id.








At the suppression
hearing, Officer Robert Salido testified that he was dispatched in reference to
a two-car accident, but while en route to the scene a second car accident
occurred.  Officer Salido described the
scene as chaotic with cars everywhere and people in the middle of the
roadway.  He and his partner stopped some
distance away and blocked off the freeway. 
Officer Salido ran up to the scene and observed bystanders trying to
help the driver of a black Saab who had been severely injured.  Officer Salido stayed with that driver until
EMS arrived and took over his care. 
Officer Salido then approached the large group of people that were
gathered, separated those who had been involved in the accident from witnesses
of the accident, and then collected identification information.  Officer Salido tried to locate the other
driver, Appellant, but from what he understood one of the EMS medics had
Appellant in the ambulance.  EMS
transported Appellant to the hospital for treatment.  Officer Salido never made contact with
Appellant at the scene.  Officer Salido
believed that Officer Silva rode with Appellant to the hospital.

Appellant
testified that the police did not take him to the hospital and that no one
accompanied him in the ambulance.  A
doctor drew his blood at the hospital. 
No police were present when the blood was drawn.  Appellant stayed at the hospital for about
four hours.  Police officers arrived an
hour and a half after he arrived. 
According to Appellant, he had no conversation with the police while at
the hospital.








Officer Vanessa
Acosta and her partner, Officer Silva, were dispatched at 2:45 a.m. that
morning to assist in closing off the freeway. 
Officer Acosta blocked off the freeway and had no contact with
individuals at the accident scene.  Her
partner walked on foot to the scene. 
Officer Acosta took care of traffic for the next several hours.  Once the freeway was re-opened, she received
a dispatch instructing her to pick up her partner at Thomason Hospital.  When she arrived Appellant and Officer Silva
were in the emergency room together. 
Appellant was wearing a hospital gown and was not handcuffed.  Appellant had already been released from the
hospital.  Officer Acosta and her partner
transported Appellant to the Special Traffic Investigations (ASTI@)
office.  She could not recall who told
them to go directly to the STI office, but more than likely this instruction
was given to her partner.  When they
arrived at headquarters, both officers escorted Appellant to the STI
office.  According to Officer Acosta,
Appellant was not escorted like they would escort a criminal defendant and he
was not in handcuffs.  Appellant was not
under arrest, and in her mind, he was not in custody at that time.  The officers escorted Appellant to the STI
office so that he would know where it was located.  Officer Acosta=s
contact with Appellant lasted about twenty to twenty-five minutes in total.








Sergeant Isaac
Hernandez with the El Paso Police Department=s
STI Unit was involved in investigating the collision on the freeway.  When Sergeant Hernandez arrived at the scene,
Appellant had already been transported to the hospital.  He first saw Appellant at police headquarters
when a female officer brought Appellant to his cubical in the STI office.  Sergeant Hernandez believed that Appellant
was in handcuffs, but was not sure. 
Sergeant Hernandez, however, did not remove any handcuffs himself and
was certain that Appellant was not in handcuffs when he spoke to him.  Sergeant Hernandez informed Appellant that he
was not under arrest at that time and that he was not going to be arrested that
morning or that day.  Sergeant Hernandez
asked Appellant if he wanted to give a voluntary statement to him as to what
happened that night.  The officer
informed Appellant that if he did not want to give a statement that would be
fine and he could leave.  He also told
Appellant that if he wanted to stop talking, he could just walk out the
door.  Sergeant Hernandez used a witness
statement form and it took about twenty minutes to take the statement.  Sergeant Hernandez typed the statement on a
computer, had Appellant read it, and then printed a hard copy.  The officer gave the copy to Appellant who
read it.  The officer then asked
Appellant if that was what he wanted to tell him and Appellant accepted the
statement without making any changes. 
Sergeant Hernandez and Officer Salido witnessed Appellant=s signature.  Sergeant Hernandez did not give Appellant any
Miranda warnings because he was not under arrest.  According to the officer, at no point did
Appellant ever indicate that he wanted to speak to a lawyer before talking and
he never asked for an attorney. 
Appellant never indicated that he did not want to talk any further.  Appellant was asked if he needed anything to
drink and if he needed to use the bathroom. 
According to Sergeant Hernandez, Appellant was not coerced in any
way.  After giving the statement,
Appellant made a phone call and was picked up by a relative.

Although Sergeant
Hernandez had not been present, he believed that Appellant was in custody at
the hospital because there was a confirmed fatality at the scene and a blood
specimen from the driver was going to be requested.  He did not believe Appellant would be free to
leave the hospital because the police were going to take a blood specimen as
standard operating procedure.  Officer
Charles Walker testified that he was dispatched to pick up a blood specimen kit
at Thomason.  When he arrived, he made
contact with Officer Silva who handed him a blood kit.  Officer Silva told him to take the kit to
headquarters immediately to submit into evidence.  Officer Walker had no contact with the person
whose blood had been drawn.  At the
conclusion of the hearing, the trial court granted Appellant=s motion to suppress the blood specimen
taken under the authority of the Transportation Code, but denied Appellant=s motion to suppress the written
statement.








In this case, the
evidence shows that Appellant was not physically deprived of his freedom of
action in any significant way.  Appellant
was transported to the hospital and remained there several hours during
treatment without police presence. 
According to Officer Acosta, Appellant was not in custody, was not in
handcuffs at the hospital, and was not in handcuffs at police headquarters.  There is no evidence that Appellant was taken
to headquarters in a forcible manner nor is there evidence that Appellant=s accompaniment was involuntary or
non-consensual.  See Shiflet, 732
S.W.2d at 629.

Officer Acosta
testified that they escorted Appellant to the STI office so that he would know
where it was located.  Appellant was not
escorted in the same manner they would have escorted a criminal defendant.  When Sergeant Hernandez met with Appellant,
he informed Appellant that he was not under arrest and was free to leave.  Appellant was not physically restrained
during the interview.  Sergeant Hernandez
told Appellant that he could stop talking and leave at any time.  Appellant was not given Miranda
warnings because Sergeant Hernandez did not believe he was under arrest.  Appellant never indicated that he wanted to
speak to a lawyer and never requested one. 
Appellant was asked if he needed anything to drink or needed to use the
bathroom.  According to Sergeant
Hernandez, Appellant was not coerced into giving his statement.  The evidence shows that the police officers
did not create a situation that would lead a reasonable person to believe that
his freedom of movement had been significantly restricted.  See Dowthitt, 931 S.W.2d at 255.  Moreover, Sergeant Hernandez told Appellant
that he was not under arrest at that time. 
Evidently, Sergeant Hernandez had no probable cause to arrest and
nothing shows that he manifested such knowledge to Appellant during the
interview.  See Dowthitt, 931
S.W.2d at 255.  According to Sergeant
Hernandez, he only asked Appellant if he wanted to give a voluntary statement
as to what happened that night.  








Appellant argues
that the State presented evidence that he was in custody and not free to leave
after he was taken to the hospital. 
Specifically, Appellant points to Sergeant Hernandez=s testimony that he was in custody
while at the hospital because the police were going to request a blood
specimen.  Even though Sergeant Hernandez
had no contact with Appellant before meeting him at the STI office, Sergeant
Hernandez believed that Appellant was in custody while at the hospital and
would not have been allowed to leave. 
Appellant also asserts that the statement was given under coercive circumstances
because he was dressed in only a hospital gown, was without any personal
belongings or transportation, and had only recently been removed from
handcuffs.  As the sole trier of fact and
judge of witness credibility, the trial court was free to disbelieve Sergeant
Hernandez=s
testimony concerning Appellant=s
status at the hospital.  See Ross,
32 S.W.3d at 855.  While it was
unexplained why Appellant was not wearing his personal clothing, the record
only indicates that Officer Acosta did not remember any of Appellant=s belongings, not that Appellant did
not have any with him.  Sergeant
Hernandez testified that Appellant was not coerced into giving the statement in
any way.  The length of the interview was
relatively short and there is no evidence that Appellant was deprived of the
ability to use the restroom, drink, or contact his family.

Examining
objectively the circumstances surrounding Appellant=s
statement, we cannot conclude that a reasonable person in Appellant=s position would have believed that his
freedom of movement had been restrained to the degree associated with a formal
arrest.  See Dowthitt, 931
S.W.2d at 254.  Since Appellant was not
in custody when he gave his statement to the police, it was not a product of
custodial interrogation.  Accordingly, we
conclude the trial court did not err in denying Appellant=s motion to suppress the
statement.  Issues Three and Four are
overruled.








SUFFICIENCY
OF THE EVIDENCE

In Issues One and
Two, Appellant challenges the legal and factual sufficiency of the evidence to
sustain his conviction.  Specifically,
Appellant contends there was insufficient evidence to prove that he was
intoxicated at the time of the accident.

Standards
of Review

In reviewing the
legal sufficiency of the evidence, we must view the evidence in the light most
favorable to the verdict to determine whether any rational trier of fact could
have found the essential elements of the offense beyond a reasonable
doubt.  Jackson v. Virginia, 443
U.S. 307, 318-19, 99 S.Ct. 2781, 2788-89, 61 L.Ed.2d 560 (1979); Hernandez
v. State, 946 S.W.2d 108, 110-11 (Tex.App.--El Paso 1997, no pet.).  We do not resolve any conflict of fact, weigh
any evidence, or evaluate the credibility of any witnesses, as this was the
function of the trier of fact.  See
Adelman v. State, 828 S.W.2d 418, 421 (Tex.Crim.App. 1992); Matson v.
State, 819 S.W.2d 839, 843 (Tex.Crim.App. 1991).  Instead, our duty is to determine whether if
both the explicit and implicit findings of the trier of fact are rational by
viewing all the evidence admitted at trial in the light most favorable to the
verdict.  See Adelman, 828 S.W.2d
at 421-22.  In so doing, any
inconsistencies in the evidence are resolved in favor of the verdict.  Matson, 819 S.W.2d at 843.








In reviewing the
factual sufficiency of the evidence, we must determine whether considering all
the evidence in a neutral light, the jury was rationally justified in finding
guilt beyond a reasonable doubt.  Zuniga
v. State, 144 S.W.3d 477, 484 (Tex.Crim.App. 2004). Evidence can be
factually insufficient if the evidence supporting the verdict, considered by
itself, is too weak to support the finding of guilt beyond a reasonable doubt,
or contrary evidence is so strong that guilt cannot be proven beyond a
reasonable doubt.  Id. at
484-85.  Our evaluation should not
intrude upon the fact finder=s
role as the sole judge of the weight and credibility given to any witness=s testimony.  Cain v. State, 958 S.W.2d 404, 407
(Tex.Crim.App. 1997).  We will not set
aside the judgment unless the evidence supporting the verdict is so weak as to
be clearly wrong and manifestly unjust.  Zuniga,
144 S.W.3d at 481.  A clearly wrong and
manifestly unjust verdict occurs where the jury=s
finding Ashocks
the conscience@ or Aclearly demonstrates bias.@ Id.  An opinion addressing factual sufficiency
must include a discussion of the most important and relevant evidence that
supports the appellant=s
complaint on appeal.  Sims v. State,
99 S.W.3d 600, 603 (Tex.Crim.App. 2003). 

Intoxicated
Manslaughter

A person commits
the offense of intoxicated manslaughter if the person operates a motor vehicle
in a public place while intoxicated and by reason of that intoxication causes
the death of another by accident or mistake. 
See Tex.Pen.Code Ann.
' 49.08 (a)(Vernon 2003).  AIntoxication@ means: 
(1) not having the normal use of mental or physical faculties by reason
of the introduction of alcohol, a controlled substance, a drug, a dangerous
drug, a combination of two or more of those substances, or any other substance
into the body; or (2) having an alcohol concentration of 0.08 or more.  See Tex.Pen.Code
Ann. '
49.01(2)(A) & (B).  

Appellant asserts
that the evidence was insufficient to prove that he was intoxicated at the time
of the accident.  Specifically, Appellant
argues that no witnesses testified that he smelled of alcohol or that he gave
signs of being intoxicated.  Further,
Appellant contends that the fact that he was intoxicated at a level of 0.1342
one hour and twenty minutes after the accident does not prove he was
intoxicated at the time of the accident.








In this case, none
of the State=s
witnesses testified that Appellant appeared intoxicated at the scene of the
accident.  Patricia Iracheta, a witness
at the scene, however, testified in detail about her contact with
Appellant.  After the accident, she ran
over to his vehicle and asked him if he was okay.  Appellant=s
nose was bleeding and there was blood all over his shirt.  Someone else at the scene helped Ms. Iracheta
open Appellant=s car
door.  He looked Adizzy,
like he was stumbling.@  Ms. Iracheta also recalled that he was Akind of disoriented.@ 
Ms. Iracheta told Appellant to sit down. 
Soon after, the paramedics arrived. 
From witness testimony, the record shows that:  (1) the road conditions were clear; (2)
accident area was well-lit; (3) the roadway was straight; (4) the scene of the
first accident was visible from two miles away; and (5) a lot of people had
pulled over to the side of the road in that area and there were many parked
cars on the side of the freeway. 
Witnesses also testified that Appellant approached the initial accident
scene at a high rate of speed and did not apply his brakes before he slammed
into the rear of the victim=s
vehicle.

The accident
occurred around 2:40 a.m. Appellant=s
blood specimen was taken at 4:15 a.m. and revealed that Appellant=s blood alcohol level was 0.1342,
approximately .05 over the legal limit. 
Dr. Haynes the State=s
toxicology expert testified that such a blood alcohol level would impair an
individual=s mental
and physical faculties.  Dr. Haynes also
opined that the individual would not be able to perform tasks that he normally
might perform with the same speed or accuracy and that his thought processes,
reasoning ability, and judgment would all be affected.  In his explanation of retrograde
extrapolation, Dr. Haynes=
testimony suggested that Appellant=s
blood alcohol level would have been higher at the time of the accident.








Having a blood
alcohol level beyond the legal limit is probative evidence of a person=s loss of his mental and physical
faculties.  Henderson v. State, 29
S.W.3d 616, 622 (Tex.App.--Houston [1st Dist.] 2000, pet. ref=d). 
In addition to the blood alcohol evidence, the jury could have
reasonably inferred from the other evidence that Appellant=s alcohol consumption had impaired his
reasoning ability and judgment at the time of the accident and as a
consequence, Appellant failed to slow down or swerve in response to the  illuminated brake lights on the victim=s vehicle in front of him.  Viewing the evidence in the light most
favorable to the verdict, we conclude there was legally sufficient evidence to
sustain Appellant=s
conviction.  Moreover, the evidence
supporting the guilty finding is not so weak as to be clearly wrong and
manifestly unjust nor was the contrary evidence so strong that the beyond a
reasonable doubt standard of proof could not have been met.  Accordingly, we conclude the evidence is both
legally and factually sufficient to sustain Appellant=s
conviction.  Issues One and Two are
overruled.

INEFFECTIVE
ASSISTANCE OF COUNSEL

In Issues Five and
Six, Appellant complains of ineffective assistance by his trial counsel.  Specifically, Appellant raises the following
instances of alleged deficient performance by counsel:  (1) failure to request the appointment of an
expert toxicologist; (2) being ill and unprepared for trial; (3) lack of
knowledge on the laws of probation and criminal causation; (4) failure to
object to retrograde extrapolation evidence; (5) pursued a legally incorrect
defense theory; (6) gave an inadequate closing argument at trial; (7) opened
the door to extraneous offense evidence as to Appellant=s
Aarrests@
at punishment; (8) failure to object to such extraneous offense evidence; (9)
failure to request that the language in Article 42.12, section 13(b) of the
Texas Code of Criminal Procedure (mandatory 120-day commitment) be included in
the punishment charge; (10) failure to request that all the mandatory
conditions of community supervision in Article 42.12, section 13 be placed in
the charge.








Standard
of Review 

We review claims
of ineffective assistance of counsel under the two-prong test set out by the
United States Supreme Court in Strickland v. Washington, 466 U.S. 668,
104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) and adopted by Texas in Hernandez v.
State, 726 S.W.2d 53, 57 (Tex.Crim.App. 1986).  To carry his burden under the first prong,
the appellant must show that trial counsel=s
performance was deficient, that is, counsel=s
representation fell below an objective standard of reasonableness.  Strickland, 466 U.S. at 687-88, 104
S.Ct. at 2064; Thompson v. State, 9 S.W.3d 808, 812 (Tex.Crim.App.
1999).  The appellant must next show that
counsel=s
deficient performance prejudiced his defense. 
Strickland, 466 U.S. at 687, 104 S.Ct. at 2064; Jackson v.
State, 877 S.W.2d 768, 771 (Tex.Crim.App. 1994).  This requires the appellant to show there is
a reasonable probability that, but for counsel=s
unprofessional errors, the result of the proceeding would have been
different.  Strickland, 466 U.S.
at 694, 104 S.Ct. at 2068; Jackson, 877 S.W.2d at 771.  A reasonable probability is a probability
sufficient to undermine confidence in the outcome.  Strickland, 466 U.S. at 694, 104 S.Ct.
at 2068; Jackson, 877 S.W.2d at 771. 
The defendant bears the burden of proving ineffective assistance by a
preponderance of the evidence.  Thompson,
9 S.W.3d at 813.








In reviewing
claims of ineffective assistance, we must indulge a strong presumption that
counsel=s conduct
falls within the wide range of reasonable professional assistance and the
appellant must overcome the presumption that the challenged conduct might be
considered sound trial strategy.  Strickland,
466 U.S. at 689, 104 S.Ct. at 2065; Thompson, 9 S.W.3d at 813.  Our review of trial counsel=s performance must be highly
deferential and every effort must be made to eliminate the distorting effects
of hindsight.  Strickland, 466
U.S. at 689, 104 S.Ct. at 2065; Stafford v. State, 813 S.W.2d 503, 506
(Tex.Crim.App. 1991).  Any allegation of
ineffectiveness must be firmly founded and affirmatively demonstrated in the
record.  Thompson, 9 S.W.3d at
813; see Jackson, 877 S.W.2d at 771. 
When faced with a silent record as to counsel=s
strategy, this Court will not speculate as to the reasons for counsel=s actions.  See Jackson, 877 S.W.2d at 771.  Indeed, when the record contains no evidence
of the reasoning behind trial counsel=s
actions, counsel=s
performance cannot be concluded as deficient. 
Rylander v. State, 101 S.W.3d 107, 110-11 (Tex.Crim.App. 2003).

Initially, we note
that Appellant did not file a motion for new trial and thus, no hearing was
held regarding Appellant=s
ineffectiveness claims.  The record
before this Court does not contain trial counsel=s
explanations of the reasons for his actions, therefore it will be difficult for
Appellant to rebut the strong presumption that trial counsel=s conduct falls within the wide range
of reasonable professional assistance.  See
Thompson, 9 S.W.3d at 814.  

Ineffective
Assistance Claims








Appellant claims
that despite his counsel=s
avowed lack of knowledge on the subject of toxicology and receipt of the State=s notice of its intent to call a
toxicologist as an expert witness, his counsel failed to request the
appointment of a toxicology expert for Appellant to better inform counsel of
the issues involved in the case and to combat the State=s
witness.  The record shows that Appellant=s trial counsel filed a motion for
appointment of an expert on February 18, 2003. 
He later filed a motion for appointment of an investigator and
reconstruction expert.  The trial court
granted Appellant=s
requests for an investigator and reconstruction expert.  The record is silent as to why counsel did
not pursue an expert in the particular field of toxicology.  Thus, Appellant has failed to overcome the
strong presumption that counsel=s
reasons for not requesting a toxicology expert was part of a sound trial
strategy.

Appellant claims
that his trial counsel was ineffective because he admitted he was ill and
unprepared prior to trial.  The record
shows that counsel requested a third continuance at a judge=s conference on February 16, 2004.  Trial counsel told the court he was ill and
not prepared.  The trial court did not
grant the continuance, but reminded trial counsel that the case had been
pending for a year.  Although the court denied
the continuance, it delayed the trial on the merits for a week.  At the next judge=s
conference on March 26, 2004, trial counsel informed the court that he was
feeling much better and would be ready for trial on the following Tuesday.  At the start of trial on March 30, 2004,
counsel announced Aready.@ 
The record does not support Appellant=s
claim that his counsel was ill during trial. 
Moreover, beyond his bare assertion, Appellant fails to show how the
alleged illness constituted ineffective assistance.








Appellant next
claims that counsel=s actions
during voir dire betray a total lack of knowledge of the law concerning the
offense charged.  Specifically, Appellant
argues that trial counsel lacked knowledge of the probation laws for an Article
42.12 A3G@ offense and lacked knowledge of
criminal causation.  The record shows
that prior to trial, counsel filed the Appellant=s
election to have the trial court assess punishment.  During voir dire, the trial court informed
counsel that since there was a deadly weapon finding in the indictment,
Appellant would be ineligible for probation if there was an affirmative deadly
weapon finding in the case.  Counsel
admitted that he had overlooked the deadly weapon allegation in the
indictment.  The State agreed to counsel=s withdrawal of the election and
counsel subsequently filed a sworn application that Appellant has never been
convicted of a felony and was eligible for a probated sentence.  Since counsel=s
mistake was quickly remedied and in fact, both the State and Appellant=s trial counsel examined the voir dire
panel on the issue of community supervision, Appellant=s
claim regarding counsel=s
alleged lack of knowledge on probation law is not supported by the record.  Further, Appellant fails to show how the corrected
error prejudiced his defense.

Appellant also
argues that his trial counsel lacked knowledge of criminal causation.  During voir dire, trial counsel emphasized to
the venire panel that the State had to prove that Aintoxication
caused the death, not other factors.@  The State objected to the misstatement of
law.  The trial court sustained the
objection and clarified that intoxication had to be a cause, but did not have
to be the sole cause of the death. 
Appellant fails to show how counsel=s
misstatement of the law was deficient performance or how the misstatement, once
corrected, prejudiced his defense. 
Further, we observe that the jury was properly instructed on criminal
causation for the offense in the court=s
charge.








Appellant next
asserts that his counsel provided ineffective assistance by allowing in
retrograde extrapolation evidence from the State=s
expert, Dr. Haynes, without objection. 
Appellant also complains that his trial counsel should have
cross-examined Dr. Haynes after the witness gave this particularly damaging
testimony.  In addition, Appellant
berates his trial counsel for totally ignoring the issue in final
argument.  The record before us, however,
is silent as to counsel=s
trial strategy with regard to scientific retrograde extrapolation evidence.  Without the benefit of a developed record, we
are hesitant to speculate on trial counsel=s
reasons for pursuing this trial strategy. 
We do note, however, that trial counsel conducted a voir dire
examination of Dr. Haynes at the time  he
was offered as an expert witness.  We
also observe that Dr. Haynes was asked if someone with a 0.1342 blood alcohol
level was capable of operating a vehicle, trial counsel objected to the
question as calling for speculation unless the doctor knew particular facts
about the individual, including what the individual drank, when he ate, and so
forth.  The State clarified that its
question was general in nature and the trial court overruled counsel=s objection.  During cross-examination, Appellant=s trial counsel attempted to attack
Dr. Haynes= opinions
for Afail[ing]
to take into consideration a lot of variables regarding each particular
individual.@  Apparently, trial counsel was attempting to
undermine the State=s expert
witness=
testimony.  Appellant directs our
attention to Blumenstetter v. State, 135 S.W.3d 234 (Tex.App.--Texarkana
2004, no pet.).  In Blumenstetter,
the Court found the first prong of Strickland was met by trial counsel=s failure to object to extrapolation
testimony by the State=s
forensic chemist.  See Blumenstetter,
135 S.W.3d at 247.  However, unlike Blumenstetter,
trial counsel did not testify at a motion for new trial hearing on his trial
strategy.  In our case, we are left to
speculate as to trial counsel=s
knowledge and familiarity with extrapolation evidence.  Any allegation of ineffectiveness must be
firmly founded in the record.  See Thompson,
9 S.W.3d at 813.  Further, the fact that
another attorney, including Appellant=s
counsel on appeal, might have pursued a different course does not support a
finding of ineffectiveness.  See Blott
v. State, 588 S.W.2d 588, 592 (Tex.Crim.App. 1979).  Because the record is silent, Appellant has
failed to rebut the presumption that the decisions made by his attorney with
regard to Dr. Haynes=
testimony were the result of a reasonable trial strategy.  See Thompson, 9 S.W.3d at 814. 








Appellant also
alleges that his trial counsel was ineffective for pursuing a fruitless
defensive theory in which he attempted to prove that the victim caused the
accident by making an improper and unsafe lane change.  Appellant argues that this defensive theory
was irrelevant and immaterial if intoxication was also a cause.  Again, the record is silent concerning why
trial counsel pursued the strategy he did. 
The record shows that the jury was charged on concurrent causation.[1]  Beyond that, we are left to speculate as to
why trial counsel decided to pursue this particular defensive strategy rather
than attack the State=s
evidence on intoxication as a cause of the accident.








Appellant also
criticizes his trial counsel=s
closing argument for failing to respond to the State=s
extrapolation evidence and by misstating the law on criminal causation for a
second time.  Closing argument is an area
where trial strategy is most evident. Thompson v. State, 915 S.W.2d 897,
904 (Tex.App.‑‑Houston [1st Dist.] 1996, pet. ref=d). 
We will review matters of trial strategy only if an attorney=s actions are without any plausible
basis.  Id.  In his closing argument, trial counsel
conceded that Appellant had been drinking. 
He directed the jury to consider the concurrent causation defensive
theory in the charge and asserted that the intoxication was not the cause of
death.  Trial counsel also admitted that
Appellant did not deny that this was an emotional case and stated that this was
truly a tragic accident.  Apparently,
trial counsel was attempting to argue that Appellant=s
intoxication was not the but for cause of the victim=s
death and was trying to gain the jury=s
sympathy.  In light of the evidence
presented, we cannot say that Appellant=s
trial counsel pursued an implausible trial strategy during trial or, in
particular, during closing argument. 
Appellant has failed to overcome the strong presumption that his trial
counsel was effective in pursuing his defensive theory during trial.

Appellant next
complains that his trial counsel was ineffective by opening the door to the
State=s
impeachment of Appellant on his prior arrests during cross-examination.  Specifically, Appellant claims that trial
counsel opened the door to impeachment on Aarrests@ when he asked Appellant, A[h]ave you ever been arrested before
for driving while intoxicated?@  When a witness creates a false impression of
law-abiding behavior, he opens the door on his otherwise irrelevant past
criminal history and opposing counsel may expose the falsehood.  Delk v. State, 855 S.W.2d 700, 704
(Tex.Crim.App. 1993); Prescott v. State, 744 S.W.2d 128, 131
(Tex.Crim.App. 1988).  To open the door
to use prior crimes for impeachment purposes, the witness must do more than
imply that he abides by the law, rather he must in some way convey the
impression that he has never committed a crime. 
See Lewis v. State, 933 S.W.2d 172, 179 (Tex.App.--Corpus Christi
1996, pet. ref=d).  Here, trial counsel=s
question was narrow and pertained only to Appellant=s
prior arrests for driving while intoxicated, not to all other arrests, if
any.  Appellant=s
answer did not create a false impression, therefore trial counsel cannot be
considered ineffective for asking Appellant the complained-of question.  

Appellant also
complains that trial counsel should have objected to the State=s 








cross-examination of Appellant as
to his prior arrests.  However, trial
counsel=s
performance cannot be held deficient in this regard because Article 37.07,
section 3 allows the trial court to admit any matter it deems relevant to
sentencing, including unadjudicated extraneous offenses.  See Davis v. State, 968 S.W.2d 368,
370 (Tex.Crim.App. 1998)(jury allowed to hear details of defendant=s criminal history when assessing
punishment).  Therefore, trial counsel=s failure to object to admissible
evidence does not constitute ineffective assistance.

Appellant next
claims that his trial counsel was ineffective for failing to request that
mandatory probation conditions be included in the court=s
punishment charge in order to bolster trial counsel=s
argument that Appellant would have to do Ajail
time@ if given
probation.  Specifically, Appellant
contends that trial counsel should have requested the language set out in
Article 42.12, Section 13(b), which requires a 120-day commitment and Section
13 generally.  Appellant asserts that
trial counsel=s action was
based on a lack of knowledge on probation. 
In terms of strategy, Appellant contends that by requesting the
mandatory conditions for DWI and intoxicated manslaughter probationers be
included in the charge--over and above the discretionary conditions of ordinary
probation, trial counsel=s
argument would have been more powerful. 
However, trial counsel=s
final argument in the punishment phase made the jury aware that one of the discretionary
conditions of probation was 180-day jail commitment.  We cannot conclude that Appellant=s trial counsel was ineffective for
failing to bolster his argument to the jury, a matter which Appellant
effectively concedes was merely an issue of trial strategy.








In his final
contention, Appellant asserts that his trial counsel=s
cumulative errors amounted to ineffective assistance.  However, because we find that Appellant has
failed to demonstrate that his trial counsel=s
performance was deficient on any ground, there can be no cumulative error or
harm.  Accordingly, we conclude that
Appellant=s
ineffective assistance claim fails in its entirety because Appellant has not
rebutted the strong presumption that counsel=s
conduct falls within the wide range of reasonable professional assistance.  See Thompson, 9 S.W.3d at 813.  Issues Five and Six are overruled. 

We affirm the
trial court=s
judgment.

 

 

October
6, 2005

DAVID WELLINGTON
CHEW, Justice

 

Before Barajas, C.J., McClure, and Chew, JJ.

 

(Do Not Publish)











[1]
The jury charge included the following: 

 

If you so find from the evidence beyond a
reasonable doubt that on the occasion, and at the time and place alleged in the
indictment the defendant, JOSE RUIZ, did, while intoxicated, operate a motor
vehicle, to wit, an automobile, and while so operating said vehicle, did
collide with an automobile in which HARALD WIENDL was an occupant, but you
further find from the evidence, or you have a reasonable doubt thereof, that
concurrently with said intoxication of defendant, if any, other cause or causes
also operated to cause the collision in question, to wit, HARALD WIENDL making
an unsafe lane change or stopping in the middle of US 54 North, and that such
other cause or causes were clearly sufficient to produce the said collision,
but the alleged operating of said motor vehicle while intoxicated, if any such
intoxication there was, was clearly insufficient to produce the collision and
ensuing death of HARALD WIENDL, then you will find the defendant not guilty of
intoxication manslaughter.