COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

 

                                        NO.
2-08-246-CR

 

 

THE STATE OF TEXAS                                                         APPELLANT

 

                                                   V.

 

CHRISTI LYNN JOHNSTON                                                      APPELLEE

 

                                              ------------

 

        FROM
COUNTY CRIMINAL COURT NO. 3 OF TARRANT COUNTY

 

                                              ------------

 

                                             OPINION

 

                                              ------------

The
State appeals from the trial court=s order
granting appellee Christi Lynn Johnston=s motion
to suppress the results of her blood test in this misdemeanor driving while
intoxicated prosecution.  We affirm the
suppression order.

Background Facts








The trial
court found the following pertinent facts. 
Officer Brett Stinson of the Dalworthington Gardens Police Department
pulled appellee over after observing her driving and learning that her vehicle
registration had expired.  After
determining that she exhibited signs of intoxication, he gave her field
sobriety tests and then arrested her for DWI. 
Officer Stinson took appellee to the Dalworthington Gardens Police
Department where he conducted a DWI interview and second field sobriety test on
video, read appellee the required statutory warnings (DIC-24 form), and asked
appellee if she would give a blood sample. 
She refused.  Officer Stinson did
not ask appellee to give a breath specimen because the department=s policy
was to ask only for a blood specimen.

After
appellee refused to give a blood sample, Officer Stinson prepared an affidavit
to obtain a search warrant authorizing a blood draw, which was authorized by a
Dalworthington Gardens city judge, who presides over a court of record.  Then Officer Darren Burkhart, with Officer
Stinson=s
assistance, Aforcibly obtain[ed]@ a blood
specimen from appellee.  Appellee
initially resisted and was Aunruly.@  Thus, the officers had to Asecure[]
[appellee=s] legs to the legs of the chair
and secure[] one arm to the arm of the chair@ with
flexible gauze.  Officer Stinson held the
other arm while Officer Burkhart obtained the blood sample from the vein in
appellee=s
wrist.  Once appellee was restrained, she
calmed down and did not resist anymore. 
The trial court found that the officers Afollowed
medically accepted procedures in drawing [appellee=s]
blood.@








The
officers drew appellee=s blood according to a
Dalworthington Gardens Police Department program

set up and . . . supervised by Dr. [Joe] Del Principe, a doctor of
osteopathy, licensed to practice medicine in the State of Texas, with 22B23 years of emergency
room experience. . . .  There
is no peer review of the program established by Dr. Del Principe nor is there
any governmental or other regulatory agency that has approved the program or
that establishes the curriculum and/or monitors any rules of compliance or
activity.

 

Officers take fourteen hours of
classroom lecture and are given a standard phlebotomy text and photocopies of
articles on venipuncture as outside reading material.  They must also do a minimum of fifty
venipuncture draws at a hospital. 
Officers Stinson and Burkhart received certificates indicating they had
successfully completed the program. 
However, the trial court found that A[t]his
course of study falls short of the minimum requirements for a person to become
a phlebotomy technician.@

At the
time of the draw, Officer Stinson was an AEMT
basic@ and
Officer Burkhart was an AEMT intermediate.@  Officer Burkhart testified at the suppression
hearing that he had performed Athousands@ of
blood draws in the sixteen years he had been an EMT.[1]








The
trial court further found that

[t]he blood draw was done in a room located in
the Dalworthington Gardens Police Department building and the room was equipped
for the purpose of doing blood draws. 
The room also was used by officers to walk through and operate the DWI
video equipment.  The room was checked
and cleaned before drawing blood in this case by the officers.  The clean room checklist . . . follows
accepted medical procedures and was followed in this case.  The room where the blood specimen was
obtained was a sanitary place for such purpose.

 

Based on
these findings of fact, the trial court concluded that Officer Stinson had
probable cause to arrest appellee, that the search warrant for appellee=s blood
was lawful and valid, and that the officers used only the force necessary to
obtain the sample.  But the trial court
further concluded as follows:

6.     In obtaining the blood
sample, the officers were acting in their capacity of peace officers gathering
evidence for a criminal prosecution and not in the capacity [of] professional
medical care providers providing medical services.

 

7.     A phlebotomist is not
automatically a qualified technician under ' 724.017 of the Transportation Code.

 

8.     The completion of the
program established by Dr. Del Principe for the Dalworthington Gardens Police
Department does not qualify one as a qualified technician under ' 724.017 of the
Transportation Code.

 








9.     [Appellee=s] blood sample was
seized pursuant to a search warrant validly executed in accordance with
articles 18.01 and 18.02 of the Code of Criminal Procedure in order to obtain
evidence to prosecute [appellee] for the crime of driving while intoxicated as
proscribed in Tex. Penal Code ' 49.04.

 

10.   Tex. Transp. Code ' 72[4].017(a) &
(c) governs the taking of blood samples seized in the prosecution of all
intoxication-related driving offenses.

 

11.   Tex. Transp. Code ' 724.017(a) &
(c) governs the taking of blood samples seized pursuant to a search warrant
under articles 18.01 and 18.02 of the Texas Code of Criminal Procedure for
intoxication-related driving offenses.

 

12.   Although the State complied
with Tex. Trans. Code ' 724.017(a) by
having the blood draw taken in a sanitary place, the seizure violated the
Fourth Amendment=s reasonableness
requirement by not being taken by medical personnel in a hospital or medical
environment.

 

13.   Officer Burkhart is not a
qualified technician under ' 724.017 of the Transportation Code.  Pursuant to the Transportation Code ' 724.017, as an EMT
Officer . . . Burkhart is specifically excluded from taking blood samples from
defendants arrested for driving while intoxicated.

 

14.   The blood seized from
[appellee] by Officer . . . Burkhart pursuant to a search warrant is not
admissible as a matter of law.

 

[Emphasis added, citation
omitted.]  Thus, the trial court ordered
that the results of appellee=s blood
test be suppressed.  The State appeals
from that order.








Standard of Review

We
review a trial court=s ruling on a motion to suppress
evidence under a bifurcated standard of review. 
Amador v. State, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007); Guzman
v. State, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997).  We give almost total deference to a trial
court=s
rulings on questions of historical fact and application-of-law-to-fact
questions that turn on an evaluation of credibility and demeanor, but we review
de novo application-of-law-to-fact questions that do not turn on credibility
and demeanor.  Amador, 221 S.W.3d
at 673; Estrada v. State, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005); Johnson
v. State, 68 S.W.3d 644, 652B53 (Tex.
Crim. App. 2002).  Because the trial
court found that each of the witnesses testifying was credible and reliable,
the issues involved in this appeal are the trial court=s legal
conclusions, which we review de novo.  See
Amador, 221 S.W.3d at 673.

Issues
on Appeal








The
State presents six points challenging the suppression order.  In its first three points, the State contends
that the trial court=s decision runs afoul of the
Fourth Amendment=s preference for warrant-based
seizures, the Fourth Amendment=s good
faith exception, and the Court of Criminal Appeals=s
opinion in Beeman v. State, 86 S.W.3d 613 (Tex. Crim. App. 2002).  In its last three points, the State
challenges the trial court=s
rulings that chapter 724 of the transportation codeCthe
implied consent statuteCgoverns the taking of blood
samples seized pursuant to a warrant, that sections 724.017(a) and (c) govern
the taking of blood samples in all intoxication-related driving offenses, and
that the Dalworthington Gardens Police Department=s blood
draw program did not comply with the transportation code.  Appellee, however, frames the issue thusly:

[I]t is undisputed that the police had probable
cause and had obtained a lawful search warrant to compel [her] to submit to the
blood draw. . . .  [But the] trial court=s
ruling . . . should be affirmed because, regardless of
the justification for issuance of the warrant, the means by which the police
chose to execute that search warrant were unreasonable.  [Emphasis added.]

 

According to appellee, then,
even blood draws pursuant to a warrant must be performed by a Acivilian health
care professional@ in a medical environment in
accordance with the minimum standards set out in chapter 724 of the
Transportation Code.  [Emphasis
added.]  Because the State briefs most of
its points together, we will address them by topic rather than in consecutive
order.

Schmerber
v. California and Chapter 724 of Transportation Code








The
Fourth Amendment protects against unreasonable searches and seizures by
government officials.  U.S. Const. amend.
IV; Wiede v. State, 214 S.W.3d 17, 24 (Tex. Crim. App. 2007).  The taking of a blood sample implicates the
Fourth Amendment.  Schmerber v.
Calilfornia, 384 U.S. 757, 767, 86 S. Ct. 1826, 1834 (1966); Ramos v.
State, 124 S.W.3d 326, 331 (Tex. App.CFort
Worth 2003, pet. ref=d).

In Schmerber,
the United States Supreme Court held that a warrantless blood draw
performed at a police officer=s
direction by a physician in a hospital Aaccording
to accepted medical practices@ was
reasonable under the Fourth Amendment.  Schmerber,
384 U.S. at 771B72, 86 S. Ct. at 1836; State
v. Comeaux, 818 S.W.2d 46, 53 (Tex. Crim. App. 1991) (plurality op.).  The Court determined that to be valid, such a
warrantless search must (1) be supported by probable cause, (2) occur in
the presence of exigent circumstances in which the delay necessary to obtain a
warrant would result in the destruction of evidence, (3) employ a
reasonable test, and (4) be executed in a reasonable manner.  Schmerber, 384 U.S. at 769B72, 86
S. Ct. at 1835B36; see Comeaux, 818
S.W.2d at 53.  The Court made clear that
when a search involves a bodily intrusion, such as a blood draw, the execution
of the search must be accomplished in a reasonable manner, i.e., according to
reasonable Ameans and procedures,@ even
when the search itself is justified.  Schmerber,
384 U.S. at 768, 86 S. Ct. at 1834; see Blumenstetter v. State,
135 S.W.3d 234, 243 (Tex. App.CTexarkana
2004, no pet.) (citing Schmerber for the holding that Athe
taking of blood by a medical laboratory technician in a hospital is a
reasonable method of extraction@).








Although
the Court specifically did not announce a holding governing cases in which the
blood was drawn somewhere other than a hospital or by a person other than a
doctor, nurse, or Amedical laboratory technician,@ the
Court did provide some future guidance as follows:

We are thus not presented with the serious
questions which would arise if a search involving use of a medical technique,
even of the most rudimentary sort, were made by other than medical personnel or
in other than a medical environment-for example, if it were administered by
police in the privacy of the stationhouse. 
To tolerate searches under these conditions might be to invite an
unjustified element of personal risk of infection and pain.

 

Schmerber, 384
U.S. at 771B72, 86 S. Ct. at 1836 (emphasis
added).








Here,
police obtained a warrant for a blood sample from appellee, who concedes on
appeal that the warrant was valid and supported by probable cause.[2]  Instead, appellee challenges Athe
means by which the police chose to execute that search warrant [as]
unreasonable.@ 
In other words, she challenges the fourth Schmerber prong, that
the search be executed in a reasonable manner. 
The State contends that the trial court should not have applied the
holding in Schmerber and the statutory requirements of chapter 724 to
determine the reasonableness of the blood draw because Schmerber and
chapter 724 apply only to warrantless blood draws.  According to the State, the fact that the
blood was seized pursuant to a valid search warrant Acontrols
this case and mandates the rejection of any attack against the admission of the
seized blood evidence.@








The
State=s
contention that the resolution of this caseCbased
upon the mere existence of a warrantCis Asimple@ ignores
the requirement that even a search authorized by a warrant must nevertheless be
executed according to reasonable means.  See,
e.g., Dalia v. State, 441 U.S. 238, 258, 99 S. Ct. 1682, 1694
(1979); Coleman v. State, 833 S.W.2d 286, 290 (Tex. App.CHouston
[14th Dist.] 1992, pet. ref=d).  The means of execution is the focus of
Schmerber=s fourth prong, not the
justification for the search, which in this case was satisfied by the police=s
procurement of a valid warrant supported by probable cause.  See State v. Davis, 207 P.3d 281, 285
(Kan. Ct. App. 2009) (holding, under Kansas law interpreting Schmerber,
that although consent effectively replaces the probable cause and exigent
circumstances requirements, it would not abrogate the State=s
responsibility to show that blood draw was nevertheless performed in reasonable
manner); Matter of Abe A., 437 N.E.2d 265, 269 (N.Y. 1982) (explaining
that valid court order or warrant based upon probable cause replaces exigent
circumstances requirement articulated in Schmerber); see also
Schmerber, 384 U.S. at 768, 86 S. Ct. at 1834.  The resolution of the matter here, then, does
not depend on whether the blood draw was taken pursuant to a warrant, as
opposed to by express or implied consent; the resolution of this issue depends
on whether the Ameans and procedures@ by
which the officers conducted the authorized blood draw were nevertheless
reasonable.  Schmerber, 384 U.S.
at 768, 86 S. Ct. at 1834.  Thus, we
overrule the State=s first point.













Under
Texas law, absent the circumstances present in section 724.012(b) of the
transportation code, police may obtain a blood sample only pursuant to the
accused=s
express consent or a valid warrant.  Tex.
Transp. Code Ann. ' 724.012(b) (Vernon Supp.
2009), ' 724.013
(Vernon 1999); Flores v. State, 871 S.W.2d 714, 720 (Tex. Crim. App.
1993), cert. denied, 513 U.S. 926 (1994); Muniz v. State, 264
S.W.3d 392, 395 (Tex. App.CHouston
[1st Dist.] 2008, no pet.); see U.S. Const. amend IV.  When police obtain a blood specimen pursuant
to a warrant, as was done here, the requirements set forth in section 724.017
regarding blood draws are not mandatory; Aconsent,
implied or explicit, becomes moot.@  Beeman, 86 S.W.3d at 616; Cantrell
v. State, 280 S.W.3d 408, 412 (Tex. App.CAmarillo
2008, pet. ref=d).  In other words, once the police obtain a
valid warrant for blood Aby presenting facts establishing
probable cause to a neutral and detached magistrate,@ the
subsequent search must be evaluated under Fourth Amendment reasonableness
standards.  Beeman, 86 S.W.3d at
615B16; Coleman,
833 S.W.3d at 290.  Because chapter 724,
the implied consent statute, does not offer greater protection than the Fourth
Amendment, and is simply Aanother method of
conducting a constitutionally valid search,@ its
prescribed method of obtaining blood draws is simply one way in which a blood
draw can be deemed reasonable for admissibility purposes[3];
that is, if a search pursuant to implied consent is performed according to the
parameters set forth in chapter 724, it will be reasonable under both the
Fourth Amendment and Texas law.  Beeman,
86 S.W.3d at 615 (emphasis added); see Tex. Transp. Code Ann. ' 724.017(a)
(Vernon Supp. 2009) (providing that blood must be drawn in Asanitary
place@ by Aphysician,
qualified technician, chemist, registered professional nurse, or licensed
vocational nurse@); see also Schmerber,
384 U.S. at 771B72, 86 S. Ct. at 1836 (authorizing
blood draw according to Aaccepted medical practices@ by
medical professional in medical environment). 
But that does not mean that another method of obtaining a specimen
pursuant to a warrant will be unreasonable under the Fourth Amendment simply
because it was not taken in strict compliance with the implied consent statute=s
requirements.  See Beeman, 86
S.W.3d at 615; cf. Schmerber, 384 U.S. at 769B72, 86
S. Ct. at 1835B36; Coleman, 833 S.W.2d
at 290 (holding that blood draw by phlebotomist pursuant to warrant was reasonable
despite language in warrant directing that draw be made by medical
doctor).  Thus, when a blood specimen is
taken in accordance with a valid warrant, we must look to guiding Fourth
Amendment principles to determine whether the method of taking the specimen is
reasonable instead of chapter 724, the implied consent statute.  Beeman, 86 S.W.3d at 615.  For this reason, we conclude that if the
requirements of the statute are considered in a Fourth Amendment case-by-case
totality of the circumstances reasonableness analysis, they are merely to be
considered as nonexclusive factors.  See
Guzman v. State, 955 S.W.2d 85, 90 (Tex. Crim. App. 1997) (AEach
search and seizure question must turn on the facts of that particular case.@).








Accordingly,
we conclude and hold that the trial court=s tenth
and eleventh conclusions of law are erroneous. 
We sustain the State=s third,
fourth, and fifth points, butChaving
determined that chapter 724 does not exclusively govern the issueCwe need
not address the State=s sixth point challenging the
trial court=s conclusion that the
Dalworthington Gardens Police Department=s blood
draw program does not comply with chapter 724.[4]  See Tex. R. App. P. 47.1; State v.
Iduarte, 232 S.W.3d 133, 140 (Tex. App.CFort
Worth 2007), aff=d, 268
S.W.3d 544 (Tex. Crim. App. 2008). 
However, because our sustaining these points does not end our inquiry
into whether the blood test results here should have been suppressed, we must
address the State=s contention that the search was
reasonable under the Fourth Amendment.[5]

Reasonableness of Blood Draw Under Fourth
Amendment

Whether
a search is reasonable is a question of law that we review de novo.  Kothe v. State, 152 S.W.3d 54, 62
(Tex. Crim. App. 2004).  Reasonableness
is measured by examining the totality of the circumstances.  Id.
at 63.  It requires a balancing of the
public interest and the individual=s right
to be free from arbitrary detentions and intrusions.  Id. 
Accordingly, we must look at all circumstances surrounding the blood
draw in this case.

Officer Stinson=s
Testimony








Officer
Stinson, the arresting officer, testified to the procedure that Dalworthington
Gardens police used in 2005 for suspicion of DWI arrests:  AYou take
them back to our jail.  We read them
through the DWI interview form, conducting the walk-and-turn test and one-leg
stand in the DWI interview room.  After
they complete that, we read the DIC-24 form, requesting a sample of blood.@  The video taken in this case confirms that
Officer Stinson followed this procedure with appellee.  Officer Stinson did not ask for a breath or
urine test, only blood, in accordance with the department rules that require
him to ask only for blood.  Appellee
refused and acknowledged her refusal by signing the DIC-24.  After appellee refused to consent to a blood
draw, Officer Stinson placed her in the booking area and obtained a search
warrant from the municipal judge.

It was three
hours and forty-five minutes to four hours after the initial stop before
Officer Stinson was able to obtain the warrant and return to the jail.  Officer Stinson explained the procedure the
department used for taking blood pursuant to a search warrant or consent:

Before we take [a suspect] in, we inspect the room to make sure it=s clean.  Before getting any needles, vials, anything
out, we wipe down the room with a commercial disinfectant to make sure
everything=s disinfected, the chair,
the table, the stool that=s in there; wipe it down
and make it as clean as we possibly can before continuing on.

 








He explained that, to his knowledge,
this procedure is followed every time officers take a blood draw; he followed
it for appellee=s blood draw.  The room is also routinely inspected to make
sure that it is clean.  Although the room
is used only for blood draws, officers have to walk through it to operate the
video recorder.

Officer
Stinson testified that appellee was Aunruly@ at
first when the officers tried to take her blood; specifically, she was Amore or
less pulling her arms up against her chest, kicking her legs, stuff of that
nature.@  Officer Stinson did not think he needed to
take appellee to the hospital because she was Afairly
cooperative@ after he and Officer Burkhart
used soft Kerlix roll gauze to restrain her feet and left wrist to the blood
draw chair.[6]  Officer Stinson assisted Officer Burkhart in
performing the blood draw by holding down appellee=s left
arm and handing him the vial.  The
officers did not videotape the blood draw because it was not required Aunder
departmental rules.@

Officer
Stinson had been trained to do blood draws under Dr. Del Principe=s
program; he had performed Aapproximately
125, 130.@ 
He had done blood draws at Arlington Memorial Hospital under the
supervision of nurses, who educated him on the Arecognized
medical procedures@ that were supposed to be
followed.  Furthermore, according to
Officer Stinson, Officer Burkhart followed these medically recognized procedures
in drawing appellee=s blood.








On
cross-examination of Officer Stinson, the following exchange occurred regarding
his and Officer Burkhart=s knowledge of appellee=s
medical condition that night:

Q.     . . . What type of
tourniquet did [Officer Burkhart] use?

A.     Latex.

Q.     Does my client have latex
allergies?

A.     Not sure.

Q.     You don=t have the slightest
clue, do you?

A.     No, sir.

Q.     Was my client on blood
thinners that night?

A.     I don=t know, sir.

Q.     You don=t have the slightest
clue, do you?

A.     No, sir.

Q.     You didn=t ask any medical history
before you stuck her or she was stuck with that needle, did you?

A.     The jailers have a full
medical history that they ask them while they=re booked into jail.

. . . .

Q.     So you had a medical
history on her before you took the blood?

A.     That=s correct.

Q.     Did you review that?

A.     No, sir.

Q.     So what good would it have
done?

A.     I=m not sure.

. . . .

Q.     . . . You didn=t know anything about her
medically, did you?

A.     No, sir.

 

Officer Stinson testified that
he did not know whether appellee=s arm
bruised; he did not check on her later that night.








According
to Officer Stinson, he was a qualified technician as a result of having gone
through Dr. Del Principe=s program.  Of the minimum of fifty sticks, or
venipunctures, he did at the hospital, only one or two of them were under the
doctor=s direct
supervision.  According to Officer
Stinson, the officers were not given Aany
specific protocol@ on what to do if a suspect was
fighting a blood draw, just Arestrain
using the least amount of force possible.@  They were never taught to take a suspect to
the hospital if that suspect was fighting them. 
They did, however, have a protocol for going to the hospital if an
officer was accidentally stuck with a needle.

Officer Burkhart=s
Testimony

At the
time of trial, Officer Burkhart was working as a firefighter in the City of
Pantego.  He had been a firefighter for
sixteen years and had six and a half years of police training.  At the time he drew appellee=s blood,
he was working as a police officer for Dalworthington Gardens.  At the time of the suppression hearing, he
was classified as an EMT-Intermediate, which meant he was allowed to Astart
IVs, intubate patients, give certain drugs and provide basic life support.@  In addition to working as a firefighter, he
worked part-time on an ambulance.








When
asked how many blood draws he had performed as an EMT, Officer Burkhart
responded, AThousands.@  He had also done Amany@
venipunctures in a hospital setting.  He
had taken over 1600 hours of classroom work for his EMT training.  He estimated that at least forty of those
hours related to Athe use of needles and . . .
blood draws, venipunctures, [and] IVs.@  The training by Dr. Del Principe was in
addition to his EMT training.  He
described Dr. Del Principe=s course
as follows:

It was how to properly obtain blood using venipuncture with
extremities only, which is the upper extremities from your shoulder down to
your fingertips.  The proper way of
cleaning the site, proper way of inserting the needle, proper way of
withdrawing the blood, and what you do after the blood=s done, how you  - - if there=s any bleeding, what you
do to stop the bleeding.

 

The
course was similar to his EMT training in that they both taught anatomy of the
arm and gave homework, including the on-site hospital training.  Officer Burkhart testified that Dr. Del
Principe was familiar with him and his ability to perform Ainvasive
medical procedures@ on patients before he went
through the course and that he had brought around fifty to one hundred patients
to Dr. Del Principe after having performed such a procedure.  Because of his prior training, he was exempt
from having to do the fifty hospital sticks that the other officers had to
do.  What Dr. Del Principe=s course
taught him matched the techniques he learned in his EMT courses.








Officer
Burkhart testified that he also had additional training through continuing
education courses that a different doctor would conduct:  AOur
doctor - - our medical director comes out and we have skill sessions where we
have to do certain skills in front of him.@  According to Officer Burkhart, neither that
doctor nor Dr. Del Principe had ever had a problem with his training and
experience in venipunctures.

Officer
Burkhart confirmed that he cleaned the blood draw room before drawing appellee=s
blood.  The officers showed appellee the
warrant and explained what they were going to do.  He confirmed they had to secure her to the
chair.  According to Officer Burkhart,
appellee said, A[D]o whatever you have to do.@  He described the procedure for drawing the
blood as follows:

Once we determine a site, we apply a tourniquet.  We look for the area where we=re going to draw the blood
from a vein.  Once the area is located,
you use Betadine because you cannot use alcohol.  We clean the site with Betadine.  From there we take a needle with a tube
holder and a tube, and we inject the needle into the - - or I=m sorry.  Place the needle into a vein.  We fill up an evidence tube or vacuum tube,
to withdraw the blood.  Once the tube=s filled up, we take the
needle out, the tube out.  We mix the
tube so that - -  there=s an anti-coagulant
powder that=s in there - - the blood
doesn=t clump together, twist -
- however you want to say - - stir or twist the tube so the powder gets into
the blood so it doesn=t clot.  Release the tourniquet, and then if there=s any bleeding, hold her
at - - pressure until the bleeding is stopped and then place a Band-aid on it.

 

He stuck her right wrist because
it was a good vein, which he had learned from both experience and training.








According
to Officer Burkhart, in taking appellee=s blood,
he did not deviate from what he had been taught; he followed the list of
guidelines given to him.  He and Officer
Stinson also did the same kinds of things that would be done at a hospital to
eliminate any unjustified risk to appellee. 
He explained,

Well, first, when we restrained her, we restrained her to protect her
from hurting herself or ourselves.  Once
she calmed down and we were able to draw the blood, I drew it correctly
without, you know, jabbing the needle in, doing anything that=s going to harm her.  I did it by what is technically correct and a
safe way of drawing blood from her.

 

Officer
Burkhart admitted he did not know whether appellee was on blood thinners,
whether she had had a mastectomy with a lymph node removal, or any other
medical condition that could have affected her health.  He admitted that knowing those things could
have been important at the time of the blood draw because she Apossibly@ could
have had a condition that might have affected her health.  Officer Burkhart did not check appellee=s arm
for bruising, nor did he know if anyone else checked on appellee after the
blood draw.

The
State asked Officer Burkhart if, as an EMT, he asks for a medical history
before doing a venipuncture; he said it depends on the situation.  When asked if he saw any evidence of internal
bleeding after taking appellee=s blood,
he responded, ANo,@
explaining that 








[t]here was just a little bit of bleeding coming out of the vein.  If you blow a vein, it=s obvious.  It swells up, bruises quickly.  And if I had been concerned, which is the
same thing, you just direct pressure and ice pack.  There was just a little bleeding coming out
of where the needle site was.

 

Dr. Del Principe=s
Testimony

Dr. Del
Principe is a doctor of osteopathic medicine; at the time of the suppression
hearing, he was a full-time emergency room doctor at Arlington Memorial
Hospital and had worked in emergency room care for approximately twenty-two or
twenty-three years.  He was the chairman
of the hospital=s Department of Emergency
Medicine, president of the group that contracted to run the hospital=s
emergency room, and Medical Services Director for Dalworthington Gardens.  He had personally performed thousands of
blood draws.  Apart from the officers he
supervised in the training program, he had trained a Afew
hundred@ others
to draw blood over the course of his career, including student nurses, doctors,
interns, and residents.








Dr. Del
Principe prepared the Dalworthington Gardens program for training officers to
draw blood after meeting with a person who runs a phlebotomy school in Phoenix,
Arizona and who had prepared a similar program.[7]  He got that person=s
curriculum and adapted it to the program he was developing, adding Asome
things that [he] thought [were] necessary to be able to train anyone to do
venipunctures to draw blood.@  According to Dr. Del Principe, there are
three sections to the course:  homework
reading material with a standard phlebotomy text and several articles on
venipuncture, a fourteen-hour classroom course with tests, and fifty or more
sticks[8]
at the Arlington Memorial emergency room under the supervision of either Dr.
Del Principe, one of the emergency room nurses, or a blood tech.  He certified the officers based on the direct
feedback he received on how they did their sticks.  The State introduced into evidence the
outline to the course.  According to Dr.
Del Principe, the manner in which the officers were trained and practiced was
in accordance with accepted medical practices. 
In addition to training the officers, he would also oversee and talk to
them on a regular basis to make sure they were not having problems.[9]

According
to Dr. Del Principe,

[P]hlebotomist really entails a lot of
things.  They do more than drawing
blood.  They will collect various
samples, whether it=s urine, stool, [or]
blood samples.  They do cultures, they
run tests on blood samples, so they do a lot more than just drawing blood.

 








That=s why in hospitals you=ll see they have people
that just - - they have just blood techs that just draw blood.  They don=t do the testing, but the phlebotomists have a
more - - I=d say more advanced
degree.  They have more training in terms
of handling blood samples; transferring blood samples, for example, the culture
mediums to run specific tests on blood samples, so they have more advanced
knowledge than a blood tech will.

 

A blood tech would just actually draw blood on
behalf of the phlebotomist, and the phlebotomist would then process in the
variety of ways whatever tests need to be run.

 

Dr. Del Principe described the
people at Arlington Memorial who were blood techs as

paramedics, firefighters that are
paramedics.  We have one individual that
basically out of high school . . . was trained by the hospital to draw blood
and has been there for a number of years. 
He does not have a phlebotomy degree, but he=s a, you know, blood draw
tech they call him.  I=m sure they have
different names for them, but he basically trained, you know, by somebody
showing [him] how to do that and then doing so many, and then he was certified
to as a qualified technician in the hospital.

 








According to Dr. Del Principe,
he trained the officers to be Aqualified
technicians,@ which is a different standard
of training than what a phlebotomist would receive because of a phlebotomist=s
additional duties other than drawing blood.[10]  Dr. Del Principe testified that the officers
he trained had the same or similar training as those working for the hospital
as blood draw techs and that with their training, the officers could work as
hospital blood techs.[11]  He stated that if any of the officers had a
problem drawing blood, they could call him to come to the station and draw the
blood or take the suspect to the hospital.

Dr. Del
Principe testified as to Officer Burkhart=s
training, stating that he was exempt from the hospital sticks because of his
extensive prior experience in drawing blood. 
He had not seen Officer Burkhart start an IV or draw blood, but he had
been in the emergency room forty or fifty times when Officer Burkhart brought
in a patient he had started an IV for, and Ahe had no
particular problems with that.@  He thought Officer Burkhart was Aexceptional@ at
venipuncture and that he would be the equivalent of a blood tech at the
hospital.

Dr. Del
Principe testified that the blood draw room was designated as such because it
had a concrete floor that could be painted and cleaned easily if there were a
blood spill.  It also had a stainless
steel table and phlebotomy chair that could be wiped down and sanitized
easily.  The chair allows the patient to
lie down in a more relaxed position and makes it easier for the person drawing
blood to obtain a specimen.  Dr. Del
Principe chose the chair because it is best for the patient.








The
State also introduced the AClean
Room Checklist@ the officers were supposed to
use when drawing blood; the copy in the record is signed by both Officer
Stinson and Officer Burkhart.  According
to Dr. Del Principe, the checklist 

systematically allows an officer to go through each of these steps to
make sure they are completing everything that needs to be completed.

 

You know, there=s always a number of
things that need to be done, and this assures that we are following strict
guidelines, strict procedures, in not only the interview, but what=s - - what supplies you
need to get out and in what order, what you need to do as far as bringing the
subject into the room.  [Emphasis added.]

 

Although Dr. Del Principe
testified that the officers ask everyone coming in for a blood draw if they
have any medical problems generally, because he trained them to do so, he
admitted that the question is not listed in the blood draw checklist.[12]  He stated that a more detailed questioning
process was not needed in the checklist because the officers are trained to ask
if a suspect has Aany particular medical problems
any time they=re arrested.@  However, he also stated that he was not
aware whether a medical history is taken when a suspect=s blood
is drawn at a hospital.








According
to Dr. Del Principe, the Dalworthington Gardens program minimizes any
unjustified risk of pain or infection for a person whose blood is drawn for
suspected DWI because the blood draw occurs in a clean room, the Apatient@ is
lying down, the officers know how to talk to the Apatients@ and
calm them down, the Apatients@ are
more relaxed because there are not a lot of people walking around and looking
at them, and there were less sick, and therefore possibly less contagious,
people than in a hospital.

Under
cross-examination, Dr. Del Principe admitted that he and the department had not
decided on a process to be followed if someone were fighting the officers and that
if the officers were unable to get blood drawn safely, they would take the
suspect to the emergency room where that person would be secured to obtain the
blood.  Dr. Del Principe nevertheless
felt that the officers who had received training from him would be qualified to
take blood from someone who was resisting and fighting.  He said that in the twenty-four years he had
been practicing, he had sometimes had to hold down persons whose blood was
being drawn for law enforcement.  When
blood draws are taken in the hospital, the officers typically help the hospital
staff secure the person whose blood is being drawn.  Dr. Del Principe admitted there are inherent
medical risks to drawing blood.  He also
stated that the only protocol for accidental needle sticks was to go to the
hospital.








Reasonableness Under Totality of
Circumstances








The
trial court found that the seizure of appellee=s blood Aviolated
the Fourth Amendment=s reasonableness requirement by
not being taken by medical personnel in a hospital or medical environment.@  [Emphasis added.]  However, most cases interpreting Schmerber
do not read it so narrowly as to restrict the location of a blood draw to a
hospital or clinic only.  Draws taken in
jails and sheriff=s offices have been upheld as
reasonable.[13]  Here, there was extensive testimony that the
trial court found to be credible as to the Aclean@ and
appropriate nature of the room in which the blood draw was taken.  Accordingly, we conclude that the location of
the draw was not inherently unreasonable under the Fourth Amendment or Schmerber
simply by virtue of it occurring in the clean room at the police station as
opposed to a Amedical environment.@













We are
more troubled by other circumstances surrounding the blood draw.  Although Dr. Del Principe testified that the
officers should have asked for at least a general medical history because he
had trained them to do so, both officers Stinson and Burkhart testified that
they failed to make even a minimal inquiry as to appellee=s health
or medical condition.[14]  In fact, such a question was not even listed
on the blood draw checklist.  Although
Dr. Del Principe testified that he was unsure whether a medical history is
taken when a suspect=s blood is drawn at a hospital,
he obviously thought that such a question was important enough to train the
officers to ask it.  And he testified
specifically as to the importance of following strict guidelines and
procedures, not only in cleaning the room, but also in performing an Ainterview@ prior
to the blood draw.   Cf. People v.
Mateljan, 28 Cal. Rptr. 3d 506, 509, 512B13 (Cal.
Ct. App. 2005, review denied), cert. denied, 546 U.S. 1171 (2006)
(affirming trial court=s denial of motion to suppress
blood draws by statutorily-unqualified phlebotomists who were otherwise
experienced in taking blood when testimony was directly conflicting as to
whether the taking of a prior medical history was necessary).  Thus, the trial court could have concluded
that, under the totality of the circumstancesCand
based on Dr. Del Principe=s credible testimonyCthe lack
of prior questioning of appellee about her general medical
history, combined with the officers= failure
to follow up on her condition, subjected appellee to an unjustified risk of
medical harm,[15]
thus making the blood draw unreasonable under the Fourth Amendment as
illustrated by the example set forth in Schmerber.








This
lack of at least a prior rudimentary inquiry into appellee=s
medical and/or general health condition and lack of at least a cursory
follow-up becomes even more troubling when considered in light of the other
circumstances surrounding this blood draw, i.e., it was taken in the privacy of
the police station without a video recording, even though one was available;
alone with two officers, including the arresting officer; restraint was
necessary; and the department did not have any guidelines for the use of force
in such a situation.[16]  Accordingly, we conclude and hold, albeit for
slightly different reasons than those specifically articulated by the trial
court in its twelfth conclusion of law, that this blood draw was not reasonable
under the Fourth Amendment and the guidance of Schmerber.

We
caution, as did the Supreme Court in Schmerber, that our decision, as in
other Fourth Amendment reasonableness cases, is based Aonly on
the facts of the present record.@  See Schmerber, 384 U.S. at 772, 86 S.
Ct. at 1836.  We do not intimate that the
inclusion of a rudimentary question about appellee=s
medical health or a brief follow-up on her condition after the blood draw is
all that would have been required to make this blood draw reasonable, nor
should our opinion be read to put a stamp of approval or disapproval on the
Dalworthington Gardens blood draw program in general.  We simply hold that, here, under the totality
of the circumstances presented, the trial court did not err by granting
appellee=s motion
to suppress.  We overrule the State=s
contention that the search was executed reasonably under the Fourth Amendment.








Applicability
of Good Faith Exception

In its
second point, the State contends that, regardless of whether the blood
extraction was reasonable under the Fourth Amendment, the trial court should
nevertheless have denied the motion to suppress because the officers obtained
appellee=s blood
in good faith reliance upon the warrant. 
Article 38.23(a) of the code of criminal procedure excludes evidence
obtained in violation of any provision of Athe
Constitution or laws of the State of Texas, or of the Constitution or laws of
the United States of America@ except
evidence obtained Ain objective good faith reliance
upon a warrant issued by a neutral magistrate based upon probable cause.@  Tex. Code Crim. Proc. Ann. art. 38.23(a)B(b)
(Vernon 2005); Dunn v. State, 951 S.W.2d 478, 479 (Tex. Crim. App.
1997).








Because
the State did not urge denial of the motion to suppress on this ground in the
trial court, however, it failed to preserve the issue for appellate
review.  State v. Mercado, 972
S.W.2d 75, 78 (Tex. Crim. App. 1998); State v. Ballman, 157 S.W.3d 65,
71 (Tex. App.CFort Worth 2004, pet. ref=d).  We may not reverse a trial court=s
suppression order on unpreserved grounds. 
Mercado, 972 S.W.2d at 77; Ballman, 157 S.W.3d at 71.  Moreover, it is doubtful whether article
38.23(b) governs the admissibility of evidence obtained pursuant to an
otherwise valid warrant, but according to an unreasonable procedure, i.e.,
whether it applies absent a technical defect in the process of obtaining a
warrant.  See United States v. Leon,
468 U.S. 897, 916, 104 S. Ct. 3405, 3417 (1984) (A[T]he
exclusionary rule is designed to deter police misconduct rather than to punish
the errors of judges and magistrates.@); State
v. Tipton, 941 S.W.2d 152, 155B56 (Tex.
App.CCorpus
Christi 1996, pet. ref=d) (reversing trial court=s order
suppressing evidence because police failed to provide defendant with copy of
affidavit referenced in warrant).  We overrule
the State=s second point.

Conclusion

Having
determined that the method of performing the blood draw in this case was
unreasonable under the Fourth Amendment, and in doing so, having overruled the
State=s
dispositive points, we affirm the trial court=s
suppression order.

 

TERRIE LIVINGSTON

JUSTICE

 

PANEL:  LIVINGSTON, MCCOY, and
MEIER, JJ.

 

PUBLISH

 

DELIVERED:  November 5, 2009











[1]He had participated in
over 1600 classroom hours as an EMT; he estimated that at least forty of those
hours related to venipuncture.  The
training he received from Dr. Del Principe was in addition to those forty
hours.  Officer Burkhart had also worked
as a firefighter, and at the time of the suppression hearing, was working as a
firefighter for the City of Pantego.





[2]Specifically, appellee
states, AIn this case, it is
undisputed that the police had probable cause and had obtained a lawful search
warrant to compel [a]ppellee to submit to the blood draw.  Thus, the first prong of the Schmerber
analysis goes in favor of the State, i.e., [a]ppellee does NOT contest that
there was sufficient probable cause to support issuance of the warrant, or
possibly, a warrantless blood draw.@





[3]Section 724.017
additionally provides a statutory framework for ensuring that blood draws are
performed in a safe manner for purposes of license revocation.  See Tex. Dep=t of Pub. Safety v.
Hutcheson,
235 S.W.3d 312, 315B16 (Tex. App.CCorpus Christi 2007, pet.
denied).





[4]Our holding also renders
the trial court=s seventh and eighth
conclusions unnecessary.





[5]Although the State did
not assign this complaint as a specific point, it does provide pertinent
argument in its brief.





[6]Officer Stinson testified
that appellee was still able to move her arm around.





[7]Dr. Del Principe admitted
that no one had reviewed his program to determine if it was in accordance with
accepted medical practices.





[8]According to Dr. Del
Principe, the sticks were required only for those who had not done sticks
before.





[9]Dr. Del Principe had also
established a two-year recertification course consisting of a one-day class and
additional sticks at the hospital if the officer had not done Aa number of sticks@ since being initially
trained.





[10]The officers= training is limited to
venous rather than arterial samples.





[11]He admitted on cross that
he did not know if they would actually be eligible for hire in that capacity at
any of the local hospitals.





[12]In addition, he admitted
the officers are not trained to ask more specific questions, such as whether a
suspect has diabetes or is taking high blood pressure medication or blood
thinners.





[13]See State v. May, 112 P.3d 39, 41B42 (Ariz. Ct. App. 2005)
(holding blood test taken at rear of police vehicle by sheriff=s department phlebotomist
reasonable); Moore v. State, 915 S.W.2d 284, 290B91 (Ark. 1996) (upholding
blood draw performed by physician, in private, at sheriff=s office because, A[a]s blood is routinely
drawn by nurses, technicians, and other non-physicians, frequently in
non-medical facilities, appellant was not in this instance subjected to an >unjustified element of
personal risk and pain=@); People v. Mari,
528 P.2d 917, 918 (Colo. 1974) (holding blood draw valid under Fourth Amendment
when taken by medical technologist at sheriff=s office); State v.
Cardona, No. CRIM. A. IN08-05-1015B18, 2008 WL 5206771, at *1B2, 8 (Del. Super. Dec. 3,
2008) (mem. op.) (upholding draw by contract phlebotomist at Wilmington Police
Department); Davis, 207 P.3d at 286 (upholding blood draw taken in
kitchen area behind sheriff=s dispatch office); State v. Sickler, 488
N.W.2d 70, 73B74 (S.D. 1992) (holding
blood draw reasonable under Schmerber when performed at county jail by
deputy sheriff who was also a licensed practical nurse); State v. Mason,
No. 02C-01-9310-CC-00233, 1996 WL 111200, at *9 (Tenn. Crim. App. Mar. 14,
1996) (not designated for publication) (concluding that blood draw need not be
taken in Ahospital environment@ to be reasonable if
performed by qualified person, in conformity with procedures established by
department of health and without threatening the health or safety of the
accused); State v. Daggett, 2001 WI App. 32, && 7B17, 250 Wis. 2d 112, 115B20, 640 N.W.2d 546, 548B51 (holding that location
of blood drawCcounty jail booking roomCwas not unreasonable
under Fourth Amendment), review denied, 2002 WI 23, 250 Wis. 2d 559, 643
N.W.2d 96; see also People v. Esayian, 5 Cal. Rptr. 3d 542, 545B46, 549B50 (Cal. Ct. App. 2003)
(upholding blood draw performed at detention facility by phlebotomoist even
though phlebotomist was unqualified under state statute and noting that Schmerber
Adid not attempt to set
any specific rules for blood tests conducted outside the hospital setting@); cf. Garcia
v. State, 112 S.W.3d 839, 848B49 (Tex. App.CHouston [14th Dist.] 2003, no pet.) (holding that
Harris County jail was Asanitary place@ under section 724.017).





[14]For purposes of this
analysis, we will presume, based on Officer Burkhart=s extensive history in
drawing blood and employing venipuncture generally as an EMT, that he was
qualified to draw appellee=s blood for purposes of obtaining a specimen as
directed by the municipal judge=s warrant, and under the Fourth Amendment and Schmerber,
regardless of the trial court=s conclusion of law number 13, which as we have
previously stated is inapplicable in that it is based on the alternative means
for a reasonable blood draw set forth in the implied consent statute.





[15]Although Officer Stinson
testified that the jailers always take a medical history, there is no evidence
in this record (a) of appellee=s medical history or (b) that any of the jailers
had medical training that would enable them to recognize a condition serious
enough to warrant communicating that information to the officer prior to a
blood draw or to provide follow-up care or recognize a subsequent medical
emergency after a blood draw.





[16]Because appellee has
conceded that the warrant was valid and based upon probable cause, we are not
presented with the equally troubling issue of the constitutionalityCor wisdomCof a program that divests
the officer of any discretion in determining what type of specimen to obtain
from a suspect, especially considering Dr. Del Principe=s admission that there
are inherent risks in drawing blood, and the officers= and Dr. Del Principe=s admissions that
different medical conditions can impact whether a blood draw is advisable
medically.  See Tex. Transp. Code
Ann. ' 724.012(c) (giving
officer discretion in asking for specimen of breath or blood); Coggins v.
State, 160 S.W.3d 177, 179 (Tex. App.CTexarkana 2005, no pet.) (same).  Moreover, under Schmerber the officer
is required to consider what method of obtaining evidence of a suspect=s blood-alcohol
concentration is reasonable under the circumstances.  384 U.S. at 771, 86 S. Ct. at 1836.  The officer should thus consider the
particular circumstances as well as the suspect=s willingness to perform
other, less intrusive means, e.g., a breathalyzer or urinalysis.  See id.  When appellee refused the blood draw, she was
not asked (nor did she offer) to take a less intrusive test, nor did she raise
any of the concerns warned of in Schmerber; instead, she said only that
she would have to ask her lawyer about it. 
See id. (A[F]or most people, the
procedure involves virtually no risk, trauma, or pain.  Petitioner is not one of the few who on
grounds of fear, concern for health, or religious scruple might prefer some
other means of testing, such as the >Breathalyzer= test petitioner refused . . . .  We need not decide whether such wishes would
have to be respected.@).